THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellant, v. SER-
RICK PRUITT *et al.*, Defendants-Appellees.

First District (1st Division)   Nos. 1—94—2387, 1—94—2388,
1—94—2538 cons.

Opinion filed February 26, 1996.

Jack O'Malley, State's Attorney, of Chicago (Renee Goldfarb, Kenneth T. McCurry, and Gael A. McCaughey-O'Brien, Assistant State's Attorneys, of counsel), for the People.

Rita A. Fry, Public Defender, of Chicago (Michael Davidson, Assistant Public Defender, of counsel), for appellees.

Patricia J. Whitten, of Board of Education of Chicago (William A. Morgan, of counsel), and Susan S. Sher, Corporation Counsel (Lawrence Rosenthall, Benna Ruth Solomon, and John H. Ehrlich, Assistant Corporation Counsel, of counsel), both of Chicago, *amici curiae*.

JUSTICE WOLFSON delivered the opinion of the court:

These three cases arise from searches of high school students in public schools by Chicago police officers. In each case the student was charged with possession of a firearm on school property in violation of section 24—1(a)(12) of the Criminal Code of 1961 (720 ILCS 5/24—1(a)(12) (West 1992)).

The charges were based on three separate incidents at three different schools. Two of the cases involved searches of students based

on an individualized suspicion that each had some type of contraband on his person. In the third case the weapon was discovered in the course of a random, mass search of the entire student body through the use of a magnetometer or metal detector.

In each case the trial judge held the seizure of a handgun violated the fourth amendment prohibition of unreasonable searches and seizures.

Our review of these cases is instructed by decisions of the United States and Illinois Supreme Courts: *Vernonia School District 47J v. Acton* (1995), 515 U.S. 646, 132 L. Ed. 2d 564, 115 S. Ct. 2386; *New Jersey v. T.L.O.* (1985), 469 U.S. 325, 83 L. Ed. 2d 720, 105 S. Ct. 733; and *People v. Dilworth* (1996), 169 Ill. 2d 195. Each decision dealt with searches of students in public schools.

Before reaching the facts of the cases before us, it would be useful to summarize the principles established in *Vernonia, T.L.O.,* and *Dilworth.*

## PRINCIPLES FOR SCHOOL SEARCHES

■ The fourth amendment to the United States Constitution, as extended to the States by the fourteenth amendment, applies to searches of students conducted by public school officials. *T.L.O.,* 469 U.S. at 333-36, 83 L. Ed. 2d at 729-31, 105 S. Ct. at 738-40.

A student's subjective expectation of privacy, in his person and in the personal possessions he carries, is an expectation that society is prepared to recognize as legitimate. *T.L.O.,* 469 U.S. at 336-37, 83 L. Ed. 2d at 731, 105 S. Ct. at 739-40.

The State cannot compel attendance at public schools and then subject students to unreasonable searches of the legitimate, noncontraband items that they carry onto school grounds. *Dilworth,* 169 Ill. 2d at 205.

School officials, when carrying out searches and other disciplinary functions in furtherance of school policies, cannot claim a parent's immunity from the restrictions of the fourth amendment. *T.L.O.,* 469 U.S. at 336-37, 83 L. Ed. 2d at 731, 105 S. Ct. at 739-40.

The main reason for lowering the fourth amendment standard applicable to searches of students in schools is to protect and maintain a proper educational environment for all students, not because of any real or imagined "special relationship" between students and teachers. *Dilworth,* 169 Ill. 2d at 211.

Teachers and administrators have a substantial interest in maintaining discipline in the classroom and on the school grounds. In recent years, school disorder "has often taken particularly ugly forms: drug use and violent crime in the schools have become major

social problems." *T.L.O.*, 469 U.S. at 339, 83 L. Ed. 2d at 733, 105 S. Ct. at 741.

The task of courts in cases like this is to strike a balance between the schoolchild's legitimate expectation of privacy and the school's equally legitimate need to maintain an environment in which learning can take place. *T.L.O.*, 469 U.S. at 340, 83 L. Ed. 2d at 733, 105 S. Ct. at 742.

■ The legality of a search of a student should depend on the reasonableness, under all the circumstances, of the search. Determining reasonableness requires the answers to two questions: first, whether the action was justified at its inception; second, whether the search as actually conducted was reasonably related in scope to the circumstances which justified the interference in the first place. *T.L.O.*, 469 U.S. at 341-42, 83 L. Ed. 2d at 734-35, 105 S. Ct. at 742-43.

Under ordinary circumstances, "a search of a student by a teacher or other school official will be 'justified at its inception' when there are reasonable grounds for suspecting that the search will turn up evidence that the student has violated or is violating the law or the rules of the school. Such a search will be permissible in its scope when the measures adopted are reasonably related to the objectives of the search and not excessively intrusive in light of the age and sex of the student and the nature of the infraction." *T.L.O.*, 469 U.S. at 341-42, 83 L. Ed. 2d at 734-35, 105 S. Ct. at 743.

The reasonableness inquiry cannot disregard the schools' custodial and tutelary responsibility for children. The State's power over schoolchildren permits a degree of supervision and control that could not be exercised over free adults. *Vernonia*, 515 U.S. at 656, 132 L. Ed. 2d at 576, 115 S. Ct. at 2392.

■ A search unsupported by probable cause can be constitutional, " 'when special needs, beyond the normal need for law enforcement, make the warrant and probable-cause requirement impracticable.' " (*Vernonia*, 515 U.S. at 653, 132 L. Ed. 2d at 574, 115 S. Ct. at 2391, quoting *Griffin v. Wisconsin* (1987), 483 U.S. 868, 873, 97 L. Ed. 2d 709, 717, 107 S. Ct. 3164, 3168.) Such special needs exist in the public school context.

The test to determine whether special needs beyond normal law enforcement require a departure from the usual fourth amendment standard of probable cause and a warrant consists of three parts. The competing interests of the individual and the State are balanced by examining: (1) the nature of the privacy interest upon which the search intrudes; (2) the character of the intrusion, which includes an examination of whether the invasion of privacy is minimal or significant; and (3) the nature and immediacy of the governmental concern

at issue, and the efficacy of the means for meeting it. *Vernonia*, 515 U.S. at 654-60, 132 L. Ed. 2d at 575-80, 115 S. Ct. at 2391-95; *Dilworth*, 169 Ill. 2d at 209.

●4 The proper fourth amendment standard to apply in cases of school searches by a liaison police officer or any public school official is that of reasonable suspicion. *Dilworth*, 169 Ill. 2d at 209.

A city police officer assigned to a school full-time as a "liaison officer" is in the same position as a school official for fourth amendment purposes, even though his primary purpose at the school is to prevent criminal activity. *Dilworth*, 169 Ill. 2d at 214.

With these principles in mind, we turn to the individual cases before us. Each involved a hearing on the defendant's motion to suppress evidence. Since neither the facts nor the credibility of witnesses is seriously questioned in any of the cases, we will accept the trial judge's findings of fact and conduct a *de novo* review of each case. See *Dilworth*, 169 Ill. 2d at 200; *People v. James* (1994), 163 Ill. 2d 302, 310, 645 N.E.2d 195.

SERRICK PRUITT

FACTS

Pruitt testified he was searched before he reached the two lines of metal detectors, one for boys and one for girls, that had been set up inside the Fenger High School on November 24, 1993. He admitted a loaded .38-caliber handgun was found in his pants pocket.

The trial judge rejected Pruitt's testimony and accepted the police officer's testimony.

The State called Officer Edward Sonne. He testified that on November 24, 1993, he was assigned to assist in a random metal detector search at Fenger. The school did not use metal detectors every day. When the school decided to conduct a metal detector search, the Chicago police department, by request of the school, would assist.

On November 24, 1993, about 40 Chicago police officers were assigned to the Fenger school to assist in the metal detector operation. Seven or eight officers were stationed in the area of the metal detectors. Officer Sonne, dressed in uniform, was stationed at the metal detector used to screen the boys.

Pruitt passed through the metal detector at about 7:50 that morning. The machine registered a positive reading, indicating that he was carrying something metal on his person. Because of the positive reaction of the magnetometer, a protective pat-down search was made. In the pat-down, Officer Sonne felt a large metal object that

felt like a gun. The object, located in Pruitt's pants pocket, was removed. It proved to be a .38-caliber revolver with a $2^1/_2$- to 3-inch barrel.

After the gun was discovered, Officer Sonne escorted Pruitt to a conference room where paper work regarding Pruitt's arrest was completed.

At the close of this evidence, the trial judge took the case under advisement. Due to comments made by the court, the State moved to reopen the case to offer further evidence to be considered on the motion. The trial court denied the request, but allowed the State to make an offer of proof for review purposes.

As part of its offer of proof, the State presented the testimony of Linda C. Layne, principal at Fenger. She explained that the school's rules and regulations are set forth in a handbook, which all students are given and required to keep with them. In the "Safe School Zone" section on page 10, the handbook notified students that "possession of guns, knives, or other weapons is forbidden and will result in arrest and expulsion from Fenger."

Principal Layne also testified that she wrote a letter to the director of safety and security for the Chicago public schools on November 2, 1993, requesting a metal detector search. The request was supported by the school's council. The letter was prompted by a shooting incident that occurred near the school on October 15, 1993, and involved Fenger students on their way to school in a bus. Shots were fired from outside the bus. There was no evidence of the identity of the shooters.

The bureau of safety and security for the school system provided Fenger with two metal detectors. They were set up for the operation on November 24, 1993. On that day about 40 police officers, who are normally assigned to various schools as part of the school patrol unit of the Chicago police department, came to Fenger school to assist. The police were under the direction of Principal Layne and the safety and security bureau officer. Approximately 900 students passed through the metal detectors that day. It took five or six seconds for each student to walk through.

Principal Layne saw Pruitt in line. She did not see him pulled out of line before going through the metal detector.

The school handbook and a written offer of proof were submitted to the court. While the trial judge did not change his mind about allowing the additional evidence, he did consider the contents of the offer of proof when announcing his decision. For that reason, and because we believe the trial judge should have allowed the additional evidence, we will consider the offer of proof as part of the record.

OPINION

■ Magnetometers, or metal detectors, have become standard equipment in airports and public buildings. They are used to detect concealed weapons. When conducted by public officers, a metal detector walk-through is a search for fourth amendment purposes. *McMorris v. Alioto* (9th Cir. 1978), 567 F.2d 897 (persons entering a State courthouse required to walk through metal detectors); *United States v. Epperson* (4th Cir. 1972), 454 F.2d 769 (airport passengers required to walk through metal detectors to reach airplanes).

Performing a search is "the very purpose and function of a magnetometer: to search for metal and disclose its presence in areas where there is a normal expectation of privacy." *Epperson*, 454 F.2d at 770.

Airport and courthouse metal detector searches are regularly upheld when challenged. Courts take judicial notice that threats of violence have been directed to these public buildings. (See *United States v. Cyzewski* (5th Cir. 1973), 484 F.2d 509.) These threats are balanced against the minimally intrusive nature of a metal detector search. The conclusion, invariably, is that the search, administrative in nature, satisfied the fourth amendment's basic concern of reasonableness.

Defendant contends the airport and courthouse cases do not apply here because those cases are based on consent. That is, the individuals facing a metal detector walk-through in an airport or courthouse can choose to turn around. Pruitt was required by law to attend school. He was given no notice that the metal detectors were inside the schools. He had no choice.

Whether airline passengers and lawyers and litigants who are due to appear in courtrooms have any real choice is a serious question we need not answer. We note, however, that the lawyers who argued this case were required to walk through metal detectors in order to reach the courtroom.

We do not believe the absence of consent has any real impact on the balancing test we are required to conduct in this school search case. The *T.L.O.* decision tells us to strike a balance between the schoolchild's legitimate expectation of privacy and the schools' equally legitimate need to maintain a safe learning environment. (*T.L.O.*, 469 U.S. at 340, 83 L. Ed. 2d at 733, 105 S. Ct. at 742.) Consent or lack of it is not part of the equation.

Eleven years ago, in *T.L.O.*, the Supreme Court observed that "drug use and violent crime in the schools have become major social problems." *T.L.O.*, 469 U.S. at 339, 83 L. Ed. 2d at 733, 105 S. Ct. at 741.

We long for the time when children did not have to pass through metal detectors on their way to class, when hall monitors were other children, not armed guards, when students dressed for school without worrying about gang colors. Those were the days when sharp words, crumpled balls of paper, and, at worst, the bully's fists were the weapons of choice.

We must consider this case and the issue of fourth amendment reasonableness in light of the times, in view of the schools' "special needs," beyond the normal need for law enforcement. We mourn the loss of innocence this case represents. We recognize, as Justice Stevens did in his concurring opinion in *T.L.O.*, the role of government as teacher:

> "The schoolroom is the first opportunity most citizens have to experience the power of government. Through it passes every citizen and public official, from schoolteachers to policemen and prison guards. The values they learn there, they take with them in life. One of our most cherished ideals is the one contained in the fourth amendment: that the government may not intrude on the personal privacy of its citizens without a warrant or compelling circumstance." *T.L.O.*, 469 U.S. at 385-86, 83 L. Ed. 2d at 763, 105 S. Ct. at 766-67.

Judges cannot ignore what everybody else knows: violence and the threat of violence are present in the public schools. The situation has worsened in the past 11 years. Schoolchildren are harming each other with regularity. See Basstian & Taylor, U.S. Department of Justice, "School Crime: A National Crime Victimization Survey Report" (NCJ-131645 1991).

In its *amicus* brief, the Chicago Board of Education (Board) informs us that during the 1990-91 school year there were 183 weapons confiscated from students at the Board's 77 high schools, 11 of the weapons from Fenger. To meet the weapons problem, the Board began the random use of metal detectors in high schools. A procedure was set up. School principals were to make the formal request for the detectors. The Board's "Policy" statement contains little in the way of standards for when and how the metal detector searches are to be conducted. It is virtually no policy at all.

The Chicago police department reports that 15 guns and 294 other weapons were confiscated from students during the 1991-92 school year as a result of 30 temporary metal detector screenings. In the 1992-93 school year, 21 screenings produced no guns and 42 other weapons. In each of the 1993-94 and 1994-95 schools years, four guns were seized from students in the screenings. (Memorandum from Randolph Barton, commanding officer, school patrol unit, to Superin-

tendent Rodriguez.[1] ) The Board cites these statistics as proof of the success of the program.

The trial judge, in his carefully considered opinion, would require either an individualized reasonable suspicion of wrongdoing or some kind of specific school plan designed to address a compelling State interest before he would approve metal detector searches of students. We share the trial judge's high regard for the constitutional right to privacy, but we cannot find in the cases we are bound to follow the requirements he would exact.

It is true that *T.L.O.* expressly reserved the question of whether individualized suspicion is an essential element of the reasonableness standard for school searches. At the same time, the Supreme Court observed that exceptions to the requirement of individualized suspicion can be appropriate "where the privacy interests implicated by a search are minimal and where 'other safeguards' are available 'to assure that the individual's reasonable expectation of privacy is not "subject to the discretion of the official in the field." ' " *T.L.O.*, 469 U.S. at 342 n.8, 83 L. Ed. 2d at 735 n.8, 105 S. Ct. at 743 n.8, quoting *Delaware v. Prouse* (1979), 440 U.S. 648, 654-55, 59 L. Ed. 2d 660, 668, 99 S. Ct. 1391, 1396.

By the time *Vernonia* was decided, the Supreme Court had held individualized suspicion was not required to conduct drug testing of railroad personnel involved in train accidents (*Skinner v. Ry. Labor Executives' Association* (1989), 489 U.S. 602, 103 L. Ed. 2d 639, 109 S. Ct. 1402), or to conduct random drug testing of Federal customs officers who carry arms or are involved in drug interdiction (*National Treasury Employees Union v. Von Raab* (1989), 489 U.S. 656, 103 L. Ed. 2d 685, 109 S. Ct. 1384), or to set up automobile checkpoints looking for illegal immigrants and contraband (*United States v. Martinez-Fuerte* (1976), 428 U.S. 543, 49 L. Ed. 2d 1116, 96 S. Ct. 3074), or checkpoints to snare drunk drivers (*Michigan Department of State Police v. Sitz* (1990), 496 U.S. 444, 110 L. Ed. 2d 412, 110 S. Ct. 2481).

The fourth amendment, the Supreme Court had said, "imposes no irreducible requirement" of individualized suspicion for these

---

[1]The Board policy and police department statistics contained in the Board of Education and City of Chicago *amicus* briefs were not made available to the trial judge. The defendants make no objection to our consideration of the *amicus* briefs in this appeal. Because we take judicial notice of the actual and potential violence in public schools our decision in this case does not rely on the information contained in the *amicus* briefs. Nor do we place any reliance on the shooting incident Principal Layne referred to in her letter to the Board. That incident was too remote in time and place to establish a reason for metal detector screening.

administrative searches. *Martinez-Fuerte*, 428 U.S. at 561, 49 L. Ed. 2d at 1130, 96 S. Ct. at 3084.

Each of the suspicionless, administrative searches upheld by the Supreme Court was conducted as part of a general regulatory scheme to ensure public safety, not as a criminal investigation to secure evidence of crime. The analogy to the metal detector screening in this case is apt.

In *Vernonia*, the Supreme Court approved a school district drug policy that authorized random urinalysis drug testing of student athletes. The decision was based on the students' decreased expectation of privacy—they were public school students; the relative unobtrusiveness of the search—producing urine samples; and the severity of the need met by the search—deterring drug use by children. The policy satisfied the fourth amendment's reasonableness requirement, said the Court. No individualized suspicion was required.

There are two reported cases on the subject of metal detector screening in public schools: *In re F.B.* (1995), 422 Pa. Super. 216, 658 A.2d 1378, and *People v. Dukes* (N.Y. Crim. Ct. 1992), 151 Misc. 2d 295, 580 N.Y.S.2d 850.

In *In re F.B.*, the court found that individualized suspicion was not required for metal detector screening at a Philadelphia high school. First, the court held the search was justified at its inception because of the high rate of violence in the Philadelphia public schools. Second, the intrusion caused by the metal detector screening was no greater than necessary to satisfy the governmental interest justifying the search. The Philadelphia screening passed the balancing test established by *T.L.O.*

*Dukes* was a trial court decision, which ordinarily would be given little precedential weight. It is, however, the first reported case in the country on the subject of metal detector screening in public schools. The judge found that the extent of violence in the public schools justified the minimal intrusion caused by the metal detectors.

■ Although we are troubled by the failure of the Chicago Board of Education to establish strict standards for the use of metal detectors, we cannot say the screening in this case violated the fourth amendment.

The searches of Pruitt and all the other Fenger students were directed and controlled by school officials, although actually carried out by Chicago police officers. The metal detectors belonged to the school board. The purpose of the screening was to protect and maintain a proper educational environment for all students, not to investigate and secure evidence of a crime. Because all students were required to walk through the detectors, no official discretion or op-

portunity to harass was involved. The intrusion was minimal, not involving any physical touching until the metal detector reacted. (Certainly it was less intrusive than the acts required of the student athletes in the Vernonia school district.) Once the metal detector reacted, the facts were sufficient to justify a frisk. See *Terry v. Ohio* (1968), 392 U.S. 1, 20 L. Ed. 2d 889, 88 S. Ct. 1868.

We find, then, that the screening satisfied the fourth amendment reasonableness test established by *T.L.O.*: the action was justified at its inception by the reality of violence in the schools; the search as conducted was reasonably related in scope to the circumstances which justified the interference in the first place.

The trial court's order suppressing Pruitt's gun as evidence is reversed and the cause is remanded for trial.

## JOHNNIE CHEATHAM

### FACTS

On April 13, 1993, Johnnie Cheatham was a 15-year-old student at Chicago Vocational High School. He was arrested that day after he was discovered carrying a loaded .22-caliber automatic pistol.

The arresting officer, Kimberly Taylor, was a Chicago police officer assigned as a school patrol officer to Chicago Vocational. She and her partner, Officer Grissett, were permanently assigned to the school as liaison officers. Under an agreement between the Board of Education and the Chicago police department, two officers are assigned to each Chicago public school to work with the school administration. Their purpose is to maintain security in the school.

Officer Taylor was the only witness to testify at the hearing on defendant's motion to suppress the gun.

On April 13, 1993, she received a message from a school security agent, Jesse Richardson, regarding a student having a weapon. Immediately, Officer Taylor contacted Richardson. He told her that a student informed him that Cheatham had a gun in school that day.

Officer Taylor, accompanied by her partner, Officer Grissett, obtained Cheatham's class schedule and then went to his classroom. Officer Taylor waited by the door of the classroom. Officer Grissett spoke to the teacher, who pointed Cheatham out. Officer Grissett approached Cheatham and asked if they "could have a word with him." Cheatham nodded and then left the classroom with the officers. They went to Room 127, a disciplinary office shared by the school patrol officers and the dean of boys. The room was located four doors down from the classroom Cheatham had been in.

Inside the office, Cheatham was asked "if he had anything in his

possession that could get him in trouble." Cheatham pointed to his left coat pocket. He then was asked what it was. He told them it was a gun. Officer Grissett then removed the gun from Cheatham's pocket.

OPINION

The trial judge held Cheatham was illegally seized when the police officers approached him in a classroom and asked if they "could have a word with him." The judge recognized that the applicable standard was reasonable suspicion, but concluded that an "uncorroborated tip from an unidentified informant is insufficient to form a basis of a reasonable suspicion."

Again, we turn to *T.L.O.* and *Dilworth.*

*T.L.O.* reminds us that reasonableness under the fourth amendment "depends on the context within which a search takes place." We must balance "the need to search against the invasion which the search entails." *T.L.O.*, 469 U.S. at 337, 83 L. Ed. 2d at 731, 105 S. Ct. at 740.

In *T.L.O.*, a teacher discovered T.L.O., a 14-year-old high school freshman, smoking in the lavatory in violation of a school rule. T.L.O. was taken to the principal's office, where she denied she had been smoking. In fact, she said she did not smoke. The assistant vice-principal demanded to see her purse. Inside it he found cigarettes and a package of cigarette rolling papers he believed were associated with marijuana use. A further search of the purse revealed a small amount of marijuana, a pipe, a number of empty plastic bags, a substantial amount of money, and a list of names of students who appeared to owe T.L.O. money. The vice-principal called the police. T.L.O. was arrested.

The Supreme Court held the search of the purse was justified at its inception because the vice-principal had reasonable grounds to suspect T.L.O. was violating school rules concerning smoking and that her purse was the obvious place to find her cigarettes. Once he found the rolling papers, it was reasonable to keep looking in the purse for marijuana.

The Supreme Court described the vice-principal's suspicion that T.L.O. had cigarettes in her purse as "the sort of 'common-sense conclusio[n] about human behavior' upon which 'practical people'— including government officials—are entitled to rely," rather than an "inchoate and unparticularized suspicion or hunch." *T.L.O.*, 469 U.S. at 346, 83 L. Ed. 2d at 737, 105 S. Ct. at 745, quoting *United States v. Cortez* (1981), 449 U.S. 411, 418, 66 L. Ed. 2d 621, 629, 101 S. Ct. 690, 695.

The Illinois Supreme Court used the same definition of reason-

able suspicion to uphold the seizure in *Dilworth*. There, Dilworth, a 15-year-old boy at a high school for students with behavioral disorders, was standing at his locker with another student named Weeks. They were approached by a Joliet police officer who was assigned full-time to the school as a liaison officer, as was the police officer in the case before us.

The officer had been told by teachers the day before that Weeks had been telling other students he had sold drugs and would bring more drugs to school the next day. The officer searched Weeks that next day, the day of Dilworth's arrest, but found nothing. He saw Weeks meet Dilworth at their neighboring lockers. He said the two boys began talking and giggling, "like they put one over on [him]." He said they turned toward him and they were "looking, laughing at [him] like [he] was played for a fool."

The officer noticed a flashlight in Dilworth's hand. He thought it might contain drugs. He grabbed the flashlight from Dilworth, unscrewed the top, and saw a bag containing a white chunky substance that turned out to be cocaine. He arrested Dilworth.

Two weeks before the day of the arrest, the officer had searched Dilworth because a teacher suspected the student of selling drugs in class. Nothing was found, although Dilworth did name another student who was found with marijuana.

The court first held that the standard of reasonable suspicion applied to the liaison police officer even though he was acting on his own initiative and authority when he seized the flashlight.

When analyzing the nature of the privacy interest on which the search intruded, the court said: "it must be remembered that we are dealing with schoolchildren here." *Dilworth*, 169 Ill. 2d at 209.

The court then applied *T.L.O.*'s two-prong test for determining whether the seizure was reasonable: the action must be justified at its inception and the search as actually conducted must be reasonably related in scope to the circumstances which justified the interference in the first place. *Dilworth*, 169 Ill. 2d at 215.

The court, using an objective standard, concluded that the totality of the circumstances would lead a reasonable person to suspect Dilworth was carrying drugs in his flashlight. Then, triggered by reasonable suspicion, the seizure of the flashlight "was reasonably related to the objectives of the search and was not excessively intrusive." *Dilworth*, 169 Ill. 2d at 216.

The three dissenting judges in *Dilworth* contended that a police officer whose primary duty is to investigate and prevent crimes should be held to the fourth amendment standard of probable cause. We are, of course, bound to follow the majority opinion.

■ Returning to the instant case, we will assume, without deciding, that Cheatham was seized within the meaning of the fourth amendment when Officer Grissett, in uniform and armed, asked if he could have a word with him outside the classroom, then brought him to an 8-foot by 10-foot room 100 feet away. We believe the information from a fellow student that Cheatham was carrying a gun on that day created a reasonable suspicion that justified the initial intrusion. The officers could not ignore the information.

The intrusion, asking him to leave the classroom, was slight, certainly more reasonable, less intrusive, and less embarrassing than questioning him in the presence of classmates. After that, there was no search until Cheatham told the officers he had a gun in his left coat pocket.

We agree with the reasoning of a California court in an almost identical situation. In *In re Alexander B.* (1990), 220 Cal. App. 3d 1572, 270 Cal. Rptr. 342, police officers conducted a search of a group of boys after being told by the school administrator he had received a "tip" from an unidentified student that one of the boys had a gun. The court said:

> "Of greater importance is the fact that the gravity of the danger posed by possession of a firearm or other weapon on campus was great compared to the relatively minor intrusion involved in investigating the veracity of the unidentified student's accusation against a handful of high school age boys.
>
> *** Under the totality of the circumstances, a cursory search of appellant and others in his group for dangerous weapons was not only reasonable, it was constitutionally compelled." *In re Alexander B.*, 220 Cal. App. 3d at 1577, 270 Cal. Rptr. at 344.

Based on the totality of the circumstances in this case, we find the trial judge erred when he suppressed Cheatham's gun. That order is reversed and the cause is remanded for trial.

## ANTHONY BROOKS

### FACTS

Two witnesses testified at the hearing—Isaiah Kurry, dean of students at Simeon Vocational High School, and Chicago police officer David Rozell.

Kurry testified that on December 3, 1993, he received a communication from another teacher, Mrs. Vaughn, regarding a stranger in the school. Kurry immediately went to Room 317, where he spoke with Mrs. Vaughn.

She told him the stranger (later identified as Brooks) was seen

coming up the rear staircase. Students are restricted from using that staircase. In addition, he was wearing a jacket. Students are not allowed to wear jackets in the school. She told Kurry the boy's behavior had been suspicious, "unnatural, he seemed to be nervous about something." Mrs. Vaughn told Kurry she saw the boy do something with his hand: "[I]t was a movement and a reaching inside of the jacket that he had on, something of that nature."

Kurry then confronted Brooks, whom he did not recognize as a student at Simeon. Brooks told Kurry his name and said that he was a student. Kurry asked Brooks to come to the office with him so he could verify his identity.

Kurry described Brooks as "cooperative and relaxed" as they walked to the office. When Kurry asked why he was not in class and had no hall pass, Brooks said he had just been reinstated at the school.

Kurry took Brooks to an administrative room that is also used by two Chicago police officers assigned to the school on a full-time basis. They went to this room because the other disciplinary room was in use. While in the office, a school administrator, Mr. Evans, came in and identified Brooks as a Simeon student.

Kurry had notified Officer Rozell, one of the two officers assigned to the school. Kurry told Officer Rozell about Mrs. Vaughn's report and her concerns about the suspicious stranger. Kurry asked Rozell "to be present in the room with me" during the interview with Brooks. Officer Rozell, in uniform, came into the office to observe the interview with Brooks.

After 45 minutes to an hour in the room, Kurry told Brooks to empty his pockets: "I asked him to empty out his pockets to, you know, further see just who he was and what, because the actual suspicion was that he had something on him that was suspicious—by his movements."

Before that moment, Brooks had been "totally cooperative" and had caused no difficulties. He had been identified as a Simeon student and he provided proof that he had been reinstated. The court asked:

> "You personally did not entertain any fear from the defendant, fear of harm by the defendant, did you?
>
> KURRY: No. Not at that time nor any time really."

When told to empty his pockets, Brooks began to comply. At that point, Officer Rozell conducted a pat-down of Brooks. He did that, he testified, because of what Kurry had told him about Brooks and because he noticed "a bulge" in Brooks' inside jacket pocket. During the pat-down Rozell felt a metal object in Brooks' inside jacket pocket. He immediately arrested Brooks, handcuffed him, and advised him of

his rights. Then he reached into Brooks' pocket and retrieved the handgun.

OPINION

■ The trial judge held, and we agree, that the defining moment in the seizure of the gun took place when Dean Kurry ordered Brooks to empty his pockets. Although Kurry testified he "asked" Brooks to empty his pockets, a request to a student from the dean of students in the presence of a uniformed police officer in a room used by the police assumes the dimension of an order.

Forty-five to sixty minutes had gone by between the time Brooks was brought to the administrative office and the request to empty his pockets. By then, Kurry apparently was satisfied with the truth of Brooks' answers: he was a reinstated student at Simeon, on his way to class. Brooks had been cooperative and responsive. Kurry had no fear of the defendant.

Officer Rozell did nothing until the "empty your pockets" order by Kurry. We find no reason to believe he would have conducted the pat-down had Kurry not issued that order. Everyone in the trial court, including the prosecutor, ignored Officer Rozell's claim he saw a "bulge" in Brooks' inside jacket pocket, but did nothing about it until Dean Kurry ordered Brooks to empty his pockets. So shall we.

The question, then, is whether Dean Kurry had a reasonable suspicion that justified the order to Brooks to empty his pockets. As *T.L.O.* teaches, the action must be "justified at its inception." There must be "reasonable grounds for suspecting that the search will turn up evidence that the student has violated or is violating either the law or the rules of the school." *T.L.O.*, 469 U.S. at 341-42, 83 L. Ed. 2d at 735, 105 S. Ct. at 743.

A reasonable suspicion is the "sort of common-sense conclusio[n] about human behavior upon which practical people—including government officials—are entitled to rely," rather than an "inchoate and unparticularized suspicion or hunch." *T.L.O.*, 469 U.S. at 346, 83 L. Ed. 2d at 737, 105 S. Ct. at 745.

An objective standard must be used in determining whether Dean Kurry had a reasonable suspicion, but his testimony about his subjective feelings "is one of the factors that may be considered in the totality of the circumstances." *Dilworth*, 169 Ill. 2d at 216.

The reasonable suspicion required for school officials to search a student is the same as the reasonable suspicion set forth in *Terry v. Ohio* (1968), 392 U.S. 1, 20 L. Ed. 2d 889, 88 S. Ct. 1868. See *People v. Taylor* (1993), 253 Ill. App. 3d 768, 772, 625 N.E.2d 785.

We need not decide whether Kurry could have ordered Brooks to

empty his pockets when they first met. At that point, Kurry had ample evidence that Brooks either had violated school rules or was a trespasser. After 45 to 60 minutes in the administrative office, the situation had changed. The reasons for Mrs. Vaughn's disquiet had dissipated. There no longer was any specific set of circumstances that would have led a reasonably prudent person to believe Brooks posed a danger to anyone or possessed any evidence of a breach of the law or of school rules. See *People v. Galvin* (1989), 127 Ill. 2d 153, 174, 535 N.E.2d 837.

Dean Kurry was acting on "an inchoate and unparticularized suspicion or hunch" when he ordered Brooks to empty his pockets. Public school student or not, Brooks possessed a fourth amendment expectation of privacy as he sat in that administrative office. The expectation was not realized.

We conclude the seizure of the gun from Brooks' jacket was not based on the reasonable suspicion required by *T.L.O.* and *Dilworth*. We affirm the trial judge's decision to suppress the evidence.

CONCLUSION

The trial judge, in his erudite opinion, said:

> "The escalation of violence in the society has manifested itself in the schools of the nation. Boards of Education, teachers, parents, and students have a right to a safe place to educate and learn. They also have a duty to take whatever lawful steps are necessary to assure that the school premises are safe and weapon free."

We agree. We have concluded, as we must, that a public school student does not lose his or her constitutional expectation of privacy simply by entering the schoolhouse, but that expectation is reduced because of the need to create a safe educational environment. Lines must be drawn.

That some fourth amendment protection remains is a point we make in the case of Anthony Brooks. We affirm the trial judge's order suppressing the gun found in his jacket.

At the same time, we find that the seizures of guns from Serrick Pruitt and Johnnie Cheatham were justified by the standards of fourth amendment reasonableness established in *Vernonia, T.L.O.*, and *Dilworth*. The trial judge's orders suppressing those guns are reversed and those cases are remanded for trial.

212

We have drawn lines.

No. 1—94—2538, Affirmed.
Nos. 1—94—2387 and 1—94—2388, Reversed and remanded.

CAMPBELL, P.J., and BUCKLEY, J., concur.