No. 2--04--0292

______________________________________________________________________________

IN THE

APPELLATE COURT OF ILLINOIS

SECOND DISTRICT

______________________________________________________________________________

BLAKE
 WILSON,
 a Minor,
 by his Mother 
 ) Appeal from the Circuit Court

and
 Next Friend, 
Cher Geiger
, ) of Du Page County.

)

Plaintiff-Appellee, )

)

v. ) No. 04--CH--478

) 

HINSDALE ELEMENTARY SCHOOL ) 
 ) 

DISTRICT 181, KEVIN CONNER, LOUISE ) 

HILLEGAS, WILLIAMS MOUCKA, DAN    )
    

RIZZARDINI, ANN SCOTT, and STEVEN )

WALLACE,
                     )     Honorable

                                     )
     Bonnie M. Wheaton,

Defendants-Appellants.
 ) 
 ) Judge, Presiding.

______________________________________________________________________________

JUSTICE KAPALA delivered the opinion of the court:

The circuit court of Du Page County entered a temporary restraining order (TRO) enjoining defendants-appellants, Hinsdale Elementary School District 181 and various of its officials (School District), from enforcing the School Board's decision to expel plaintiff-appellee, Blake Wilson (the student), for the remainder of the school year.  The School District brings this interlocutory appeal of that order, pursuant to Supreme Court Rule 307(d) (188 Ill. 2d R. 307(d)). 

I. BACKGROUND

On March 1, 2004, the assistant principal of Clarendon Hills Middle School discovered that the student, an 11-year-old sixth grader, brought to school two compact discs (CDs) containing a song created and performed by the student and a friend.  The song was titled "Gonna Kill Mrs. Cox's Baby."  Mrs. Cox is the student's science teacher and was pregnant during the time period relevant to this case.  Because the lyrics of the song were for the most part unintelligible, the student, when instructed to do so, wrote down the following lyrics:

"Gonna Kill Mrs. Cox's baby, gonna Kill Mrs. Cox's baby.  I don't care, I don't care. Gonna Kill Mrs. Cox's baby, gonna kill Mrs. Cox's baby, (squeal), rock n' roll.  I love Detroit, man.

I'm done.  We're done."

The student admitted that he sang the lyrics in the recording, "burned" the song onto two CDs, and wrote the words "Gonna Kill Mrs. Cox's Baby" on one of the CDs.  The student also admitted that he gave the CDs to two students on March 1, 2004.  One of those students shared the title of the song with other students and played the song two times on a computer in the school's computer lab.  On March 2, 2004, the student and his parents were advised that the student was not to return to school and that the student was suspended from school from March 2, 2004, to March 15, 2004.  

On March 16, 2004, a hearing officer appointed by the School Board held an expulsion  hearing.  The student was represented by legal counsel at the hearing.  The School District alleged gross disobedience and misconduct on the student's part as grounds for his expulsion.  The School District presented the testimony of the school's principal and assistant principal who, in addition to testifying about the student's misconduct on March 1, 2004, and the subsequent investigation, related that the student was generally an "A student" with no previous behavioral problems.  The assistant principal explained that when he asked the student why he created the CD, the student said that he was uncomfortable with Mrs. Cox's pregnancy and that he did not like the way that she taught.  The School District also presented various documents, including the School District's violence policy and the Clarendon Hills Middle School Handbook, which contains a section prohibiting student violence including threats of violence.

At the expulsion hearing, the student called seven witnesses.  Officer Ted Jenkins of the Clarendon Hills police department testified that he interviewed the student in connection with his investigation of the incident.  According to Officer Jenkins, the student was remorseful and cooperative, but a bit upset, and in fact cried at a couple of points.  Officer Jenkins found no evidence that the student had the intention to actually harm Mrs. Cox, and he found no evidence that the student ever conveyed any kind of threat to Mrs. Cox.  The officer opined that the student was not dangerous and did not intend to harm Mrs. Cox.

Chris Wilson, owner of the music studio where the student takes guitar lessons, testified that the student is a serious musician, and is generally polite and respectful.  She said that she has never seen or heard of the student engaging in any type of violence.  She opined that such behavior  would be out of character for the student.

Alan O. Sykes, professor of law at the University of Chicago Law School, testified that the student is a good friend of his daughter.  Professor Sykes said that he has never seen the student engage in any acts of violence or lose his temper.  Professor Sykes opined that the student would not use violence against a teacher.

Michael Bradburn, pastor at Redeemer Lutheran Church in Hinsdale, testified that he has known the student for 10 years and has never seen the student engage in any type of violence, lose his temper, or threaten anyone.  Pastor Bradburn also spoke of the student's involvement at church and his contribution of his musical skills to the worship band.  Pastor Bradburn opined that the student would never do anything to hurt anyone and said that he was surprised that the student made a CD with inappropriate lyrics.

Susan Francis, a social worker, testified that she spent an hour and 15 minutes with the student the day before the expulsion hearing.  Francis opined that the student is not the type of boy who is likely to harm someone or to commit an act of violence against someone.

Lanny Wilson testified that he is the student's father and an obstetrician and gynecologist.  Dr. Wilson related that he did not think for even one second that his son actually intended to threaten or harm Mrs. Cox or her baby.  Dr. Wilson has never seen his son commit any act of violence.

Cher Geiger, the student's mother, testified that she has never seen her son engage in any act of violence or threaten anyone with violence.  Geiger related that she is a psychologist and that, based on both her professional experience and her personal experience with her son, she believed that her son  was merely expressing frustration and had no intention to threaten or harm Mrs. Cox.  Geiger testified that a clinical psychologist, whom she does not know personally, evaluated her son and concluded that he has no early warning signs of a likelihood to engage in acts of violence.  Geiger opined that her son would not be a danger to any student or to school personnel were he allowed to return to school.

At the conclusion of the evidentiary portion of the proceedings before the hearing officer, the principal recommended that the student be expelled for the remainder of the school year.  The principal also said that, based on the student's academic performance, he would be allowed to enter the seventh grade at Clarendon Hills Middle School the following fall.  Counsel for the student recommended that he be suspended for 15 days. 

 The hearing officer submitted a fact-finding report dated March 19, 2004, in which he found that the student did the acts outlined by the School District, including writing, singing, and recording a song that contained threatening lyrics, titled "Gonna Kill Mrs. Cox's Baby"; frightening a staff member; distributing the song on CD; and disrupting the school's educational program.  The School Board considered the hearing officer's fact-finding report at its March 22, 2004, meeting and voted to expel the student for the rest of the school year (approximately 50 days) in accordance with section 10--22.6 of the Illinois School Code (105 ILCS 5/10--22.6 (West 2002)).

On March 24, 2004, the student filed a verified complaint for injunctive relief, requesting that the trial court temporarily and permanently enjoin the School District from expelling the student from school and conducting any further disciplinary proceedings.  The complaint also requested an order immediately reinstating the student in Clarendon Hills Middle School.  On the same day, the student filed an emergency petition for a temporary restraining order.  In the petition, the student contended that the School Board's decision to expel him on the evidence gathered at the hearing was arbitrary, unreasonable, and capricious.

On March 25, 2004, the trial court entered the following order:

"Upon full hearing on petition for TRO, the court finds that plaintiff has established a protectable interest in Blake's right to a public education, that plaintiff has no adequate remedy at law and Blake will suffer irreparable harm if he is prohibited from attending school as Blake cannot make up for days lost due to the expulsion, that plaintiff has established a strong likelihood of success on the merits based on the following factors: (1) Blake's conduct was not so egregious because he did not directly cause any disruption at school; rather the disruption resulted from the investigation; (2) Blake has no history of disciplinary problems; (3) [there is] no evidence in the record that anything resulted in a failure to deliver educational services to the students; (4) expulsion is the most severe punishment; (5) the interests of Blake favor not expelling him; and (6) base [
sic
] on Blake's age (11), he is not held to the understanding of a 16 or 17 year-old student.  Accordingly, the court enters a Temporary Restraining Order prohibiting defendants from expelling Blake Wilson from school and orders that he be allowed to attend Clarendon Hills Middle School.  This TRO enters without bond as no evidence exists of damages or potential damages to defendants.

Case continued to April 13, 2004; 10:00 a.m. [courtroom] 2007 for hearing on [the motion for] preliminary injunction without further notice."

The School District timely appeals the above order.

II. ANALYSIS

On appeal, the School District contends that the trial court abused its discretion in granting the TRO because it failed to balance the hardships of the parties, and because it improperly concluded that the student had a likelihood of success on the merits.  The student has failed to file a responding memorandum pursuant to Rule 307(d)(2) (188 Ill. 2d R. 307(d)(2)).  However, we find that the record and issues involved are simple enough that we can decide the appeal.  See 
First Capitol Mortgage Corp. v. Talandis Construction Corp.
, 63 Ill. 2d 128, 133 (1976).  We agree with the School District's second contention and, therefore, hold that the student was not entitled to a TRO in view of the student's likely lack of success on the merits.

A TRO is an emergency remedy issued to maintain the status quo until the case is disposed of on the merits.  
Passon v. TCR, Inc.
, 242 Ill. App. 3d 259, 264 (1993).  A trial court's order granting or denying a TRO is reviewed for an abuse of discretion.  
Stocker Hinge Manufacturing Co. v. Darnel Industries, Inc.
, 94 Ill. 2d 535, 541 (1983).  A party seeking a TRO must establish, by a preponderance of the evidence, that (1) he or she possesses a certain and clearly ascertainable right needing protection, (2) he or she has no adequate remedy at law, (3) he or she  would suffer irreparable harm without the TRO, and (4) he or she has a likelihood of success on the merits.   
Lo v. Provena Covenant Medical Center
, 342 Ill. App. 3d 975, 987 (2003).

"School discipline is an area which courts enter with great hesitation and reluctance--and rightly so.  
School officials are trained and paid to determine what form of punishment best addresses a particular student's transgression.  They are in a far better position than is a black-robed judge to decide what to do with a disobedient child at school.  They can best determine, for instance, whether a suspension or an after-school detention will be more effective in correcting a student's behavior.  Because of their expertise and their closeness to the situation--and because we do not want them to fear court challenges to their every act--school officials are given wide discretion in their disciplinary actions."  
Donaldson v. Board of Education for Danville School District No. 118
, 98 Ill. App. 3d 438, 439 (1981).

Where no deprivation of a constitutional right is alleged, a decision to suspend or expel a student will be overturned only if it is arbitrary, unreasonable, capricious, or oppressive. 
 
Lusk v. Triad Community Unit No. 2
, 194 Ill. App. 3d 426, 427 (1990); 
Clements v. Board of Education of Decatur Public School District No. 61
, 133 Ill. App. 3d 531, 533 (1985); 
Wilson v. Collinsville Community Unit School District No. 10
, 116 Ill. App. 3d 557, 561-62 (1983); 
Donaldson
, 98 Ill. App. 3d at 439.  The punishment imposed on a student must be sufficiently egregious in order to come within the narrow concept of arbitrary or capricious official conduct that justifies the extraordinary intervention by the court in the operation of a public school of this state.  
Clements
, 133 Ill. App. 3d at 537.

Thus, in order for the student to obtain a TRO temporarily enjoining the School District from enforcing the decision to expel him, he needed to show, 
inter
 
alia
, that he is likely to establish, by a preponderance of the evidence at the upcoming proceeding on his complaint to permanently enjoin the expulsion, that the School Board's decision was arbitrary, unreasonable, capricious, or oppressive.  As an appellate court reviewing the trial court's entry of this TRO, it is our role to decide whether the trial court abused its discretion in determining that the student was likely to succeed on the merits of his action to  permanently enjoin his expulsion.  See 
Stocker Hinge Manufacturing Co.
, 94 Ill. 2d at 541.  In other words, we must decide whether the trial court abused its discretion in determining that the student was likely to show that the School Board's disciplinary decision was unreasonable, arbitrary, capricious, or oppressive.  A trial court abuses its discretion when its decision is arbitrary or exceeds the bounds of reason.  
Prairie v. Snow Valley Health Resources, Inc.
, 324 Ill. App. 3d 568, 571 (2001).  Because we find that it exceeds the bounds of reason to conclude that the student showed that he was likely to succeed on the merits of his claim for a permanent injunction, we hold that the trial court abused its discretion in entering the TRO. 

The trial court applied the five factors stated in 
Robinson v. Oak Park and River Forest High School
, 213 Ill. App. 3d 77, 82 (1991), in making its determination that the School Board's decision in this case would likely be found to be unreasonable, arbitrary, capricious, or oppressive.  The 
Robinson
 factors are (1) the egregiousness of the student's conduct; (2) the history or record of the student's past conduct; (3) the likelihood that such conduct will affect the delivery of educational services to other children; (4) the severity of the punishment; and (5) the interest of the child.  
Robinson
, 213 Ill. App. 3d at 82. 

With regard to the first of the 
Robinson
 factors, the trial court found that the student's conduct was not so egregious because he did not directly cause any disruption at school; rather the disruption resulted from the investigation.  We disagree with the trial court's conclusion that the disruption of the educational process was not the result of the student's misconduct.  Simply stated, had the student not composed, performed, and then distributed at school the song, "Gonna Kill Mrs. Cox's Baby," there would have been no disruption whatsoever.  Unfortunately, at this point in time we live in a society where horrific violence in the schools of our country is all too common.  See 
People v. Pruitt
, 278 Ill. App. 3d 194, 202 (1996), citing Basstian & Taylor, U.S. Department of Justice, "School Crime: A National Crime Victimization Survey Report" (NCJ-131645 1991) ("Judges cannot ignore what everybody else knows: violence and the threat of violence are present in the public schools.  The situation has worsened in the past 11 years.  School children are harming each other with regularity").  Consequently, it is unreasonable to suggest that, in order to avoid a disruption at school, the administration should have turned a blind eye upon its discovery of students in possession of CDs containing a song, the title of which and chorus of which are an unambiguous statement that a teacher's baby was going to be killed.  Even counsel for the student, in his opening remarks to the trial court at the hearing on the petition for the TRO, made the point that "whenever a circumstance presents itself to a school administration where there's any type of potential for violence that conduct or circumstance has to be thoroughly investigated." 

Moreover, it is not unreasonable to conclude that the student's conduct was egregious enough to result in the 50-day expulsion irrespective of any disruption of the educational process.  It is not important to decide whether the student's conduct caused such disruption, because the threat alone constituted "gross disobedience or misconduct."  That the student's conduct constituted an expellable violation of school rules is not in dispute.  Section 10--22.6 of the School Code empowers school boards to "expel pupils guilty of gross disobedience or misconduct."  105 ILCS 5/10--22.6 (West 2002).  According to the School District's policy:

"Behavior constituting gross disobedience or misconduct includes, but is not limited to, the following:

10. Use of any form or type of aggressive behavior that does physical or psychological harm to someone else and/or urging other students to engage in such conduct.  Prohibited aggressive behavior includes, without limitation, the use of violence, force, noise, coercion, threats, intimidation, fear, bullying, or other comparable conduct."

Also, the Clarendon Hills Middle School Handbook contains a section entitled, "Student Violence - Board Policy," which provides in pertinent part:

"Student violence and/or threat of student violence against any student, district staff member, and/or district property will not be tolerated.

Types of violent/threatening conduct include but are not limited to:

***

-threatening, planning, or conspiring with others to engage in a violent activity.

-joking about engaging in violent acts against others, or otherwise making statements, threats, or intimidating remarks (bullying) which might reasonably be interpreted by others as indicating a threat or plan to engage in some type of violent activity.

Students violating any provision of this policy will be subject to appropriate discipline, up to and including suspension and expulsion.
"  (Emphasis in original).

Clearly, the student committed a violation of school rules that subjected him to possible expulsion.  What is in dispute in this case is the propriety of the penalty chosen by the School Board.  More specifically, in the context of the petition for the TRO to enjoin the expulsion, the issue is whether it is likely that the student will be able to show in the upcoming proceedings to determine whether he is entitled to a permanent injunction that the School Board's choice of penalty was unreasonable, arbitrary, capricious, or oppressive. 

In the proceedings before the School Board's hearing officer, as well as those before the trial court, much was made of the fact that there was no evidence showing that the student had any intention to carry out his threat of violence against Mrs. Cox or her baby.  Threats of violence in school are not permitted, serious or not.  Undoubtedly, a threat made in jest is less egregious than one that the threatener earnestly intends to carry out.  However, a threat of violence is no less egregious at the time it is made simply because it is subsequently shown that the threatener had no intention to carry out his threat.  When a threat of violence like the one in this case is made, there is no way to immediately determine whether the threatener intends to carry it out or has made it for some other reason, such as intimidation or simply because he is an adolescent lacking good judgment.  For these reasons, we believe that it was an abuse of discretion to conclude that, in the proceedings on the student's request for permanent injunctive relief, it will likely be determined that the student's conduct was not egregious enough to warrant the penalty imposed by the School Board.

With respect to the second 
Robinson
 factor, we agree with the trial court's conclusion that the student has no history of disciplinary problems. Accordingly, this factor weighs in favor of choosing a lesser sanction from the range of permissible penalties for the student's conduct.

The third 
Robinson
 factor is the likelihood that the student's conduct affected the delivery of educational services to other children.  On this point the trial court said, "there's no indication that anything other than the buzz that surrounded this entire situation was in any way detrimental to the delivery of educational services."  We disagree.  The evidence shows that Mrs. Cox required a day off of work to recuperate from her emotional distress, thereby depriving her pupils of her services for that day; the Clarendon Hills police department was called in to investigate the incident; concerned teachers were briefed by the administration regarding what had occurred and what action the school was taking; and parents of students telephoned the school to find out what was happening.  The student's misconduct, at a minimum, took administrators away from their regular duties so that they could perform investigative functions and  inform concerned employees and parents that the school was handling the situation.  These occurrences were the direct result of the student's conduct.  It is untenable to conclude that, in the future proceeding seeking a permanent injunction, it is likely that these occurrences will not be deemed to have affected the delivery of educational services.  

With regard to the fourth 
Robinson
 factor, the severity of the punishment, the trial court found that expulsion is the most severe punishment.  While it is true that expulsion is the most severe form of punishment, it is important to recognize that the student did not receive the most severe expulsion that state law permits.  A school board can expel a student for up to two calendar years if the student has engaged in disobedience or gross misconduct.  105 ILCS 5/10--22.6(d) (West 2002).  In contrast, a suspension from school can be for no longer than 10 days.  105 ILCS 5/10--22.6(c) (West 2002).  Accordingly, an expulsion from school can be for as short a duration as 11 days and as long a duration as 2 calendar years.  In this case, the School Board expelled the student for the remainder of the school year, approximately 50 school days.  At the expulsion hearing, counsel for the student recommended a suspension for 15 days, which, for that duration, could only be an expulsion.  Since school officials are given wide discretion in their disciplinary actions (Donaldson, 98 Ill. App. 3d at 439), it would be difficult to conclude that an expulsion for either of these periods would be unreasonable, arbitrary, capricious, or oppressive.  An expulsion for a period longer than 50 days, for example the remainder of this school year and all of next year, although also within the range of permissible expulsion periods, may have been an unreasonable, arbitrary, capricious, or oppressive punishment.  However, we cannot accept the conclusion that a 50-day expulsion will likely be deemed unreasonable, arbitrary, capricious, or oppressive in the student's action seeking a permanent injunction.  This is especially true where the School Board's selection of a 50-day expulsion demonstrates a measured decision on the School Board's part and not simply the imposition of the most serious penalty it could impose on the student.  Moreover, the possibility that the student's sixth-grade marks will be detrimentally affected by the expulsion adds little to the severity of the punishment.  The record demonstrates that the student will be allowed to return to school next fall as a seventh-grader.  Additionally, it has been observed that a middle school student is not a high school student whose "grades are usually thought of as being more important and can affect a student's educational and employment prospects after he leaves public school."  
Donaldson
, 98 Ill. App. 3d at 440.  

The fifth and final 
Robinson
 factor is the interest of the child.  The trial court found that the interest of the student favors not expelling him.  The trial court's finding at this stage of the proceedings is a holding that it is likely that in the proceedings seeking a permanent injunction, the duration of the expulsion determined by the School Board will be deemed unreasonable, arbitrary, capricious, or oppressive because it is not in the student's interest.  We disagree.  Certainly reasonable minds could conclude that the student is better off in school than he is elsewhere for the last 50 days of his sixth-grade school year.  However, it is also reasonable to conclude that expulsion from school for a 50-day period will impress upon the student the seriousness of his misconduct and the importance of altering his behavior.

The trial court added a sixth factor to its analysis, the age of the student.  The trial court said, "I think the Court must look at the wisdom and judgment of an 11-year-old which is obviously less that it would be in a 16- or 17-year-old."  We fail to appreciate how the age of the student factors into the analysis of the issue facing the trial court, specifically, whether it is likely that the School Board's decision as to the penalty it chose was unreasonable, arbitrary, capricious, or oppressive.  It would certainly be arbitrary and unreasonable to punish a middle school student with penalties designed to punish only high school students' misconduct.  That, however, is not what occurred here.  The rules applicable to students at Clarendon Hills Middle School prohibit threats of violence.  The student made such a threat and was expelled from school for 50 days, a sanction that was within the permissible range of penalties applicable to middle school students for such misconduct.

Having determined that all but one of the five 
Robinson
 factors will likely weigh in favor of concluding that the decision of the School Board to expel the student for the remainder of the school year was not unreasonable, arbitrary, capricious, or oppressive we hold that the trial court abused its discretion in finding a strong likelihood of the student's success on the merits.  Thus, we hold that the trial court abused its discretion in issuing the TRO.  Our determination that the student is not likely to succeed on the merits of his complaint for permanent injunctive relief does not foreclose the possibility that he may ultimately prevail on the complaint. 

III. CONCLUSION

The judgment of the circuit court of Du Page County granting the student's petition for a TRO is reversed and the TRO is vacated.  

Reversed; order vacated.

BYRNE, J., concurs.

JUSTICE McLAREN, dissenting:

I respectfully dissent.  The standard of review is whether the trial court's findings of fact are against the manifest weight of the evidence and whether the trial court's exercise of discretion based upon those facts is an abuse of discretion.  "An abuse of discretion occurs when no reasonable person would take the position adopted by the lower court."  
McKenzie Dredging Co. v. Deneen River Co.
, 249 Ill. App. 3d 694, 700 (1993).  The test is not whether the appellate court agrees with the trial court's decision, but whether the lower court " 'acted arbitrarily without the employment of conscientious judgment or, in view of all the circumstances, exceeded the bounds of reason and ignored recognized principles of law so that substantial prejudice resulted.' "  
Zurich Insurance Co. v. Raymark Industries, Inc.
, 213 Ill. App. 3d 591, 594-95 (1991), quoting 
In re Marriage of Aud
, 142 Ill. App. 3d 320, 326 (1986); see also 
American Federation of State, County and Municipal Employees, Council 31 v. Schwartz
, 343 Ill. App. 3d 553, 559 (2003)
; 
In re J.S.
, 267 Ill. App. 3d 145, 148 (1994); 
Kaden v. Pucinski
, 263 Ill. App. 3d 611, 615 (1994).

Considering the trial court's grant of a temporary restraining order in the perspective set forth above, I am constrained to determine that other reasonable minds could or would also grant the
 
temporary
  restraining order.

I tend to believe that the majority, rather than applying the appropriate standard outlined above, has considered the appeal as if it were an appeal from a final hearing on the merits, and has not given the trial court's judgment the deference to which it is entitled in matters relating to temporary restraining orders or preliminary injunctions.

It is quite possible that the final resolution of the cause will result in expulsion.  However, that is not the issue at this stage of the proceedings, unless that determination is based upon a belief that no reasonable individual would disagree, based upon the record 
as it exists today
, 
that there is no probability of success on the merits.  The student is not seeking total immunity from punishment, as indicated by his suggestion that he be suspended for 15 days.  He is seeking a lesser punishment.  In that regard, in my opinion, there is a probability of success on the merits.