ADOLF LO, Plaintiff-Appellee, v. PROVENA COVENANT MEDICAL CENTER, Defendant-Appellant.

Fourth District    No. 4—03—0175

Argued June 19, 2003.—Opinion filed July 31, 2003.

976

Stephen R. Swofford, Nancy G. Lischer (argued), Peter G. Panno, and Daniel P. Slayden, all of Hinshaw & Culbertson, of Chicago, for appellant.

Thomas J. Pliura (argued), of Leroy, and Michael W. Rathsack, of Chicago, for appellee.

Saul J. Morse and Robert John Kane, both of Illinois State Medical Society, of Springfield, for *amicus curiae*.

JUSTICE APPLETON delivered the opinion of the court:

Plaintiff, Adolf Lo, is a physician and a member of the medical staff of defendant, Provena Covenant Medical Center, a licensed hospital. Defendant summarily suspended plaintiff's clinical privilege to perform open-heart surgery, allegedly because an independent peer review had identified problems in his open-heart surgeries and he had expressed an intention to perform more such surgeries without the precautionary measure on which defendant had insisted: direct supervision by another cardiac surgeon. Plaintiff sued defendant for breach of contract, and the trial court entered an order temporarily restraining defendant from suspending any of plaintiff's clinical privileges.

Defendant appeals on three grounds: (1) defendant's decision to summarily suspend plaintiff's clinical privilege violated no bylaw and, therefore, the trial court lacked authority to review the decision; (2) under federal and state law and defendant's bylaws, defendant had ultimate authority over its medical staff, including the authority, on its own initiative, to suspend clinical privileges of a physician who posed an imminent risk of harm to patients; and (3) plaintiff failed to establish the requisites for a temporary restraining order. Because the summary suspension violated no bylaw, we reverse the trial court's judgment.

## I. BACKGROUND

Defendant's owner, Provena Hospitals, has adopted the "Bylaws of Provena Covenant Medical Center Local Governing Board[,] Urbana, Illinois" (hospital board's bylaws), which provide as follows:

> "*Section 1.1—Authorization.* The board of directors of PRO-VENA HOSPITALS has authorized the establishment of a Local Governing Board ('Hospital Board') to have such authority and responsibilities with respect to the governance of the day to day business and affairs of Provena Covenant Medical Center ('Hospital') as are set forth in these bylaws and as the PROVENA HOSPITALS Board may from time to time delegate. ***

> * * *

> *Section 4.1—Delegated Authority.* The Hospital Board has been delegated authority and responsibility by the PROVENA HOSPITALS Board, for the following functions ***:

\* \* \*

(h) To serve as the official governance mechanism of the Hospital to its Medical Staff and to act on recommendations from the Hospital's Medical Staff, to include but not limited to \*\*\* clinical privileges \*\*\*.

(i) To maintain a liaison with the Hospital's Medical Staff by including the president of the Medical Staff as an *ex-officio* director of the Hospital Board in order to promote favorable working relationships and exchange information for the improvement of patient care.

\* \* \*

*Section 8.1—Medical/Dental Staff Responsibilities.* The Hospital Board shall, in the exercise of its discretion, delegate to the Medical/ Dental Staff the responsibility for providing appropriate professional care to all patients of the Hospital, as well as the authority to carry out the designated responsibilities.

The Medical/Dental Staff of the Hospital shall make recommendations to the Hospital Board concerning all matters set forth in the Medical/Dental Staff bylaws and all additional matters referred to it by the Hospital Board.

*Section 8.2—Medical/Dental Staff Bylaws.* There shall be bylaws \*\*\* for the Medical/Dental Staff setting forth its organization and governance. Proposed bylaws \*\*\* may be recommended by the Medical/Dental Staff, which shall only become effective upon the adoption thereof by the Hospital Board.

*Section 8.3—Quality of Care Monitoring.* The Hospital Board shall require the Medical/Dental Staff to implement activities and mechanisms for monitoring and evaluating the quality of patient care, for identifying opportunities to improve patient care, and for identifying and resolving problems or deficiencies, and shall regularly report to the Hospital Board on these matters.

\* \* \*

*Section 8.5—Delegated Powers.* \*\*\* In all applicable matters, this Article is subject to the policies of PROVENA HOSPITALS, including, but not limited to, ensuring compliance with State of Illinois license requirements[ ] [and] Joint Commission on Accreditation of Health Care Organizations \*\*\*."

Pursuant to section 8.2 of the hospital board's bylaws, the medical staff recommended bylaws, which the hospital board adopted. The medical staff's bylaws provide:

"[I]t is recognized that the medical staff is responsible for the quality of medical care and must accept and discharge this responsibility, subject to the ultimate authority of the medical center board of directors \*\*\*. \*\*\*

* * *

## ARTICLE 3.

## PURPOSES

The purposes of this organization [(the medical staff)] are:

* * *

3.3 to serve as the primary means for accountability to the [defendant's] Board of Directors for the appropriateness of the professional performance *** of its members *** and to strive towards the continual improvement of the quality and efficiency of patient care delivered in the Medical Center ***.

3.4 to provide a means through which the Medical Staff may participate in the policymaking and planning processes of the Medical Center ***.

* * *

## ARTICLE 8.

## CORRECTIVE ACTION

8.1 Procedure

8.1.1 Any person may provide information to the medical staff about the conduct, performance, or competence of its members. Whenever reliable information indicates that the activity or professional conduct of any member of the Medical Staff is considered to be lower than the standards of the Medical Staff, detrimental to public safety or disruptive to the delivery of quality patient care, corrective action against such practitioner may be requested by any officer of the Medical Staff, by the chair of any clinical department, by the chair of any standing committee of the Medical Staff, by the Chief Executive Officer, or by the Board of Directors. All requests for corrective action shall be made to the Executive Committee in writing, and shall be supported by reference to the specific activities or conduct which constitute the grounds for the request.

* * *

8.2 Summary Suspension

8.2.1 Whenever action must be taken immediately to prevent imminent danger to an individual, the chair of a department, the President of the Medical Staff, an officer of the Medical Staff, or the Chief Executive Officer upon the recommendation of any one of those aforementioned, is authorized to summarily suspend the Medical Staff membership status or all, or any portion, of the clinical privileges of a practitioner. ***

8.2.2 A practitioner whose clinical privileges have been summarily suspended shall be entitled to the procedural rights set forth in Article 9 of these Bylaws ***."

The parties agree that the above-quoted bylaws of the hospital board and medical staff were in force when defendant summarily suspended plaintiff's clinical privilege to perform open-heart surgery.

Defendant first became concerned about its cardiovascular-surgery program when reviewing patients' statistics from January 2000 to May 2001. Plaintiff was one of two cardiovascular surgeons on the medical staff. For the cardiovascular-surgery program as a whole (that is to say, for the two surgeons' combined efforts), the mortality rate was 7%, the rate of return to surgery after cardiovascular surgery was 13.1%, and the rate of readmission into the hospital within 30 days after cardiovascular surgery was 19.3%. The mortality rate of plaintiff's patients was 5.3% for 2000, 5% for 2001, and 5% for 2002. By contrast, during the same period, the national rate of mortality for open-heart surgery was 3% for 2000 and 2.3% for 2001.

Because of the allegedly high rates of mortality and complications, defendant contracted with a team of independent consultants to review defendant's cardiovascular-surgery program and report their findings. In its report, the "peer-review team" identified problems with plaintiff's cardiovascular surgeries. According to a letter to plaintiff from the chairperson of defendant's board of directors, "the report raised grave concerns about quality, far more concerns than any of us had anticipated."

Defendant began a dialogue with plaintiff to come up with mutually acceptable remedial measures. (Plaintiff disputed the validity and significance of the statistics or that there was any problem with his cardiovascular surgeries.) Defendant asked plaintiff to come up with an action plan, and plaintiff delayed doing so. For several months, the parties wrangled over an "action plan." Finally, plaintiff consented to perform cardiovascular surgery only under the direct supervision of either of two named cardiac surgeons affiliated with Carle Clinic. He thereafter performed some cardiovascular surgeries under supervision. Later, he withdrew his consent to supervision, because he thought defendant was imposing "inappropriate and stringent requirements" on the cardiac surgeon supervising his surgeries, namely, that the supervisor must see the patient before surgery, remain throughout surgery, and see the patient after surgery. Plaintiff notified defendant that he had scheduled an open-heart surgery and would perform it without supervision.

Alarmed by that announcement, defendant's president and chief executive officer, Diane Friedman, sought a recommendation from persons on the medical staff that plaintiff's clinical privilege to perform open-heart surgery should be summarily suspended pursuant to section 8.2.1 of the medical staff's bylaws. She spoke with the president

of the medical staff, an officer of the medical staff, and a department chairman. Friedman states in an affidavit:

"I was told by those individuals that either they did not want to get involved in litigation themselves or, in the case of the [p]resident of the [m]edical [s]taff, wanted legal advice in this matter. He was leaving *** town and asked the [s]ecretary-[t]reasurer of the [m]edical [s]taff to get involved. The [s]ecretary-[t]reasurer then obtained legal advice and would not agree to get involved ***."

Plaintiff was the chairman of the department of surgery.

After Friedman reached a dead end with the medical staff, the executive committee of defendant's board of directors held a special meeting. In the minutes of that meeting, they found that "a cooperative effort is not being undertaken by the medical staff so that the medical center may properly fulfill its obligations to its patients" and "imminent danger to patients exists if [plaintiff] were to perform an open[-]heart surgery procedure not under the direct supervision of another qualified cardiac surgeon." Therefore, the committee authorized Friedman to summarily suspend plaintiff's clinical privilege to perform open-heart surgery if plaintiff persisted in his rejection of supervision. Citing section 8.2.1 of the medical staff's bylaws and the executive committee's resolution, Friedman notified plaintiff, by letter, that she was summarily suspending his clinical privilege to perform open-heart surgery. She advised him of his right to a hearing under section 8.2.2 and article 9 of the medical staff's bylaws.

Plaintiff brought this action against defendant, alleging that the summary suspension violated the bylaws, under which defendant could summarily suspend clinical privileges only upon the recommendation of a member of the medical staff. The trial court entered an order "temporarily restrain[ing] [defendant] from suspending the medical staff membership of all or any portion of the clinical privileges of plaintiff until such time as defendant complies with section 8.2.1 of the medical staff bylaws."

This appeal followed. We address only the trial court's temporary restraining order and not the remaining stages of this litigation.

## II. ANALYSIS

### A. Standards of Review

■ This appeal requires us to apply three standards of review. We will ask whether the temporary restraining order was an abuse of discretion. *Ron Smith Trucking, Inc. v. Jackson*, 196 Ill. App. 3d 59, 63, 552 N.E.2d 1271, 1275 (1990). When reviewing the factual findings on which the trial court based its temporary restraining order, we will

ask whether they are against the manifest weight of the evidence. *Ron Smith Trucking*, 196 Ill. App. 3d at 63, 552 N.E.2d at 1275. Insomuch as we must interpret bylaws, regulations, and statutes, we will interpret them *de novo*. *C.J. v. Department of Human Services*, 331 Ill. App. 3d 871, 879, 771 N.E.2d 539, 547 (2002); *Butler v. USA Volleyball*, 285 Ill. App. 3d 578, 582, 673 N.E.2d 1063, 1066 (1996); *People v. Hanna*, 332 Ill. App. 3d 527, 530, 773 N.E.2d 178, 180 (2002).

## B. Violation of a Bylaw

■ Courts are ill-qualified to run a hospital, but they can read and interpret bylaws. Therefore, when a physician sues over the suspension of a clinical privilege, the court will ask only one question: did the suspension violate any bylaw? *Adkins v. Sarah Bush Lincoln Health Center*, 129 Ill. 2d 497, 506-07, 544 N.E.2d 733, 738 (1989). If the suspension violated no bylaw, the court will defer to the superior qualifications of the hospital officials who made the decision. *Adkins*, 129 Ill. 2d at 507, 544 N.E.2d at 738. (Of course, if a court has authority to review the suspension of a clinical privilege for compliance with bylaws, the mere denomination of the clinical privilege as a "privilege" rather than a "right" does not mean that plaintiff lacks a remedy for improper suspension of the privilege.)

Plaintiff contended, and the trial court agreed, that because no one on the medical staff had recommended the summary suspension of plaintiff's clinical privilege to perform open-heart surgery, defendant's imposition of the suspension violated section 8.2.1 of the medical staff's bylaws. That section provides that when necessary to "prevent imminent danger to an individual," the chief executive officer has the authority to summarily suspend clinical privileges *"upon the recommendation of"* a department chair, the president of the medical staff, or an officer of the medical staff. (Emphasis added.)

Defendant counters that to accept plaintiff's argument, one would have to regard section 8.2.1 with tunnel vision, ignoring other provisions of the bylaws as well as federal and state law. The medical staff's bylaws state, for example, that the medical staff is "subject to the ultimate authority of the medical center board of directors." Further, according to the medical staff's bylaws, the medical staff is to "serve as the primary means of accountability to the [b]oard of [d]irectors for the appropriateness of the professional performance *** of its members."

Under the hospital board's bylaws, the medical staff is "subject to the ultimate authority" of the hospital board, which has the duty to "assure that there are *** practices which comply with the requirements for *** quality improvement, particularly emphasizing the assessment and continuous improvement of the quality of patient care."

■ The bylaws echo the requirements of state and federal law. A hospital must have an "effective governing body legally responsible for the conduct of the hospital as an institution." 42 C.F.R. § 482.12 (2001). The governing body "must *** [e]nsure that the medical staff is accountable to the governing body for the quality of care provided to patients." 42 C.F.R. § 482.12(a)(5) (2001); see 42 C.F.R. § 482.22(b) (2001); 210 ILCS 85/4.5(b)(2) (West 2002) ("a single medical staff accountable to the board of directors"). "The [governing] board shall be responsible for the maintenance of standards of professional work in the hospital and shall require that the medical staff function competently." 77 Ill. Adm. Code § 250.210(f) (Conway Greene CD-ROM March 2002).

Defendant reasons that because the hospital board has a duty to maintain the quality of medical care in the hospital and the medical staff is accountable to the hospital board for the quality of care, the chief executive officer can summarily suspend clinical privileges upon the resolution of the hospital board, and not merely upon the recommendation of members of the medical staff, when necessary to protect patients from imminent harm.

■ Defendant finds authority for the summary suspension in section 10.4(b)(2)(C)(i) of the Hospital Licensing Act (210 ILCS 85/10.4(b)(2)(C)(i) (West 2002)), which provides:

"Nothing in this subparagraph (c) [(creating a right to a hearing on summary suspension)] limits a hospital's *** right to summarily suspend, without a prior hearing, a person's *** clinical privileges if the continuation of practice of a medical staff member constitutes an immediate danger to *** patients ***."

We agree with defendant's interpretation of that statute. Section 10.4(b)(2)(C)(i) plainly presupposes that the hospital has an inherent right to summarily suspend the clinical privileges of a physician whose continued practice poses an immediate danger to patients.

That right necessarily flows from the ultimate responsibility that federal and state law places on the hospital board for the quality of care. The governing body of a hospital "must *** [e]nsure that the medical staff is *accountable* to the governing body for the quality of care provided to patients." (Emphasis added.) 42 C.F.R. § 482.12(a)(5) (2001). "The [governing] board shall be responsible for the maintenance of standards of professional work in the hospital and shall *require* that the medical staff function competently." (Emphasis added.) 77 Ill. Adm. Code § 250.210(f) (Conway Greene CD-ROM March 2002).

"Accountability" would be an empty word without the means of holding someone accountable. "Responsibility" would be an empty

word without the means of fulfilling that responsibility. If the medical staff had the power to veto any restrictions the hospital would impose on a physician's defective practice—if the hospital could stop substandard treatment only upon the medical staff's recommendation or approval—the medical staff would effectively not be "accountable" to the hospital for the quality of care, and the hospital could not "require" the medical staff to do anything to eliminate an imminent danger to patients.

■ If, without the medical staff's approval, a hospital could not summarily suspend the clinical privilege of a physician whose patients have a mortality rate twice that of the national average, the hospital could not do so if the mortality rate rose to 10 times that of the national average. Until the medical staff saw fit to act, the hospital would be at the mercy of the physician's incompetence. "The hospital may be liable for a physician's misconduct on a *respondeat superior* theory when an employer-employee or principal-agent relationship is present or for the violation of an independent duty owed by the hospital to review and supervise medical care administered to the patient." *Alford v. Phipps*, 169 Ill. App. 3d 845, 858, 523 N.E.2d 563, 571 (1988). Under plaintiff's interpretation of the bylaws, defendant would have to pay the bill for a staff member's medical malpractice but would be powerless (without the medical staff's recommendation) to prevent the malpractice in the first place. Defendant could only stand aside, making feeble noises of protest, while its "ox got gored."

If a bylaw, properly interpreted, put a hospital in that untenable position, we would strike it down as a violation of public policy. Bylaws are unenforceable to the extent that they violate statutes or regulations. *Garibaldi v. Applebaum*, 301 Ill. App. 3d 849, 858, 704 N.E.2d 698, 705 (1998), *aff'd in part & rev'd in part on other grounds*, 194 Ill. 2d 438, 742 N.E.2d 279 (2000). Federal and state regulations place ultimate responsibility for the quality of medical care squarely on the governing board's shoulders. 42 C.F.R. § 482.12(a)(5) (2001); 77 Ill. Adm. Code § 250.210(f) (Conway Greene CD-ROM March 2002). "Hospitals have an independent duty to provide for the patient's health and welfare." *Berlin v. Sarah Bush Lincoln Health Center*, 179 Ill. 2d 1, 19, 688 N.E.2d 106, 114 (1997). "[T]he hospital may owe a duty, *independent of any relationship between physician and patient*, to review and supervise the medical care administered to a patient." (Emphasis added.) *Gilbert v. Sycamore Municipal Hospital*, 156 Ill. 2d 511, 518, 622 N.E.2d 788, 792 (1993). Any bylaw that effectively prevented the governing board from performing that duty would be void.

Just as we should interpret contracts in such a way that they do

not violate public policy (if the contractual language reasonably allows such an interpretation) (*West Bend Mutual Insurance Co. v. Mulligan Masonry Co.*, 337 Ill. App. 3d 698, 705, 786 N.E.2d 1078, 1084 (2003)), we should interpret section 8.2.1 of the medical staff's bylaws in such a way that it does not violate public policy. Section 8.2.1 says that the chief executive officer "is authorized" to summarily suspend a practitioner's clinical privileges "upon the recommendation of" the chair of a department, the president of the medical staff, or an officer of the medical staff. On its face, section 8.2.1 does not say that the chief executive officer can impose the summary suspension *only* upon their recommendation. The hospital itself has inherent authority to summarily suspend clinical privileges to prevent an imminent danger to patients. 210 ILCS 85/10.4(b)(2)(C)(i) (West 2002). To that end, the chief executive officer can impose a summary suspension on the authority of the hospital board.

By stating that the chief executive officer may suspend clinical privileges upon the recommendation of members of the medical staff, section 8.2.1 merely acknowledges that such decisions should normally be the result of a collaboration between the governing body and medical staff. The Joint Commission on Accreditation of Healthcare Organizations (Joint Commission) requires that the "governing body" make decisions on clinical privileges "based on medical staff recommendations, in accordance with the bylaws." Joint Commission on Accreditation of Healthcare Organizations, Comprehensive Accreditation Manual for Hospitals: The Official Handbook, MS.5.1, at MS-7 (2002 ed. updated January 2002) (hereinafter Handbook). The Handbook allows the governing body to delegate to "a committee of the governing body" (not to the medical staff) "the authority to render *** renewal or modification of clinical privileges decisions." Handbook, MS.5.1.1, at MS-7. Further, the commentary on MS.5.1 and MS.5.1.1 says: "*The governing body is not bound by the medical staff recommendation* but has the ultimate authority to render a decision, adverse or not, as long as the decision is neither arbitrary, capricious, discriminatory, nor contrary to the bylaws." (Emphasis added.) Handbook at MS-32. We assume the medical staff intends its bylaws to meet the Joint Commission's requirements for accreditation of a healthcare organization— including the requirement that the governing body have authority, with or without the medical staff's recommendation, to summarily suspend clinical privileges to prevent an imminent danger to patients.

Of course, the danger to patients must be genuine and imminent. Otherwise, the summary suspension would be arbitrary and capricious and contrary to the bylaws. The summary suspension must be an informed decision, and, on the record before us, we have no reason to

doubt that it was. Contrary to plaintiff's assertion, defendant did not rely merely on its own interpretation of statistics. A peer-review team identified problems. The governing body should seek input from its medical staff, but the governing body remains the ultimate decision-maker and can rely on other sources of information besides the medical staff.

As *amicus curiae*, the Illinois State Medical Society raises the specter of "lay control of professional decision-making." It argues that "[t]o accept the ultimate decision-maker[']s flagrant dismissal of any input from the medical staff would be to establish a 'buyer beware' atmosphere in the provision of health[,] making meaningless the protections provided by state law and professional accreditation standards and recognized by the Illinois Supreme Court." This argument overlooks the fact, however, that under "state law and professional accreditation standards," the governing body has ultimate responsibility for the quality of medical care, and it can and must fulfill that responsibility, whether the medical staff makes the appropriate recommendation or not. This is an anomalous case in which the medical staff failed to act one way or the other. It declined to make a recommendation for or against the proposed summary suspension of plaintiff's clinical privilege to perform open-heart surgery.

The *amicus curiae* further argues that by upholding defendant's right to summarily suspend clinical privileges without the medical staff's recommendation, we would undercut the supreme court's prohibition of the corporate practice of medicine. See *Berlin*, 179 Ill. 2d at 10, 688 N.E.2d at 110. The supreme court held that the prohibition does not apply to licensed hospitals; "concern for lay control over professional judgment is alleviated in a licensed hospital, where generally a separate professional medical staff is responsible for the quality of medical services rendered in the facility." *Berlin*, 179 Ill. 2d at 18, 688 N.E.2d at 113-14. The *amicus curiae* reasons that if defendant can summarily suspend clinical privileges without the medical staff's recommendation, "concern for lay control over professional judgment" is *not* "alleviated."

On the contrary, we conclude the concern is indeed alleviated in the present case, because defendant summarily suspended plaintiff's clinical privilege not on the basis of a layperson's uninformed assessment of his performance but on the basis of an independent medical peer review. Section 10.8(a)(2) of the Hospital Licensing Act (210 ILCS 85/10.8(a)(2) (West 2002)) provides:

> "(a) Physician employment by hospitals and hospital affiliates. Employing entities may employ physicians to practice medicine in all of its branches provided that the following requirements are met:

\*\*\*

> (2) Independent physicians, who are not employed by an employing entity, periodically review the quality of the medical services provided by the employed physician to continuously improve patient care."

It does not appear, from the record, that plaintiff is defendant's "employee" in the sense of receiving a W-2 form from defendant (see 210 ILCS 85/10.8(b) (West 2002)), but we nevertheless find section 10.8 instructive, by analogy, on the division of labor between the medical staff and governing board of a hospital. Section 10.8(a)(3) forbids the employer from "unreasonably exercis[ing] control, direct[ing], or interfer[ing] with the employed physician's exercise and execution of his or her professional judgment in a manner that adversely affects the employed physician's ability to provide quality care to patients." 210 ILCS 85/10.8(a)(3) (West 2002). Section 10.8(b)(1) provides, however: "Situations in which an employing entity does *not* interfere with an employed physician's professional judgment include \*\*\* practice restrictions based upon peer review of the physician's clinical practice to assess quality of care and utilization of resources in accordance with applicable bylaws." (Emphasis added.) 210 ILCS 85/ 10.8(b)(1) (West 2002). Defendant did not interfere with plaintiff's professional judgment by summarily suspending his clinical privilege on the basis of the peer review.

To secure a temporary restraining order, plaintiff had to establish, by a preponderance of the evidence, that (1) he possessed a certain and clearly ascertainable right needing protection, (2) he had no adequate remedy at law, (3) he would suffer irreparable harm without the temporary restraining order, and (4) he had a reasonable likelihood of success on the merits. See *Ron Smith Trucking*, 196 Ill. App. 3d at 63, 552 N.E.2d at 1275. As the fourth element implies, plaintiff did not have to prove his case on the merits; he merely had to raise a "fair question" about the existence of his right—enough of a question to justify preserving the status quo until his case is decided on the merits. See *Buzz Barton & Associates, Inc. v. Giannone*, 108 Ill. 2d 373, 382, 483 N.E.2d 1271, 1275 (1985).

Because the summary suspension in this case violated no bylaw, we hold that plaintiff failed to raise a "fair question" about his right to relief. The trial court abused its discretion in granting the petition for a temporary restraining order.

### III. CONCLUSION

For the foregoing reasons, we reverse the trial court's judgment.

Reversed.

KNECHT and McCULLOUGH, JJ., concur.