2020 IL App (2d) 190381
No. 2-19-0381
Opinion filed August 13, 2020

IN THE

APPELLATE COURT OF ILLINOIS

SECOND DISTRICT

| | | |
|---|---|---|
| *In re* MARRIAGE OF KIMBERLY SOLECKI, | ) ) ) | Appeal from the Circuit Court of Du Page County. |
| Petitioner-Appellant, | ) ) | |
| and | ) ) | No. 17-MR-1449 |
| THOMAS J. SOLECKI JR., | ) ) ) | Honorable Linda E. Davenport, |
| Respondent-Appellee. | ) | Judge, Presiding. |

PRESIDING JUSTICE BIRKETT delivered the judgment of the court, with opinion.
Justices Schostok and Brennan concurred in the judgment and opinion.

**OPINION**

¶ 1 In January 2015, the trial court entered a judgment dissolving the marriage of petitioner, Kimberly Solecki, and respondent, Thomas J. Solecki Jr. Incorporated into the dissolution judgment was a marital settlement agreement (MSA) by which respondent agreed to pay petitioner a percentage of his net income as monthly child support. The MSA further provided that each year the parties would conduct a "true-up," based on respondent's tax documents, to determine if he paid the proper amount of support in the prior year. Subsequently, respondent filed a motion to modify child support. He asked the court to reduce his monthly support obligation and calculate true-up amounts for the years 2015, 2016, and 2017. Following a hearing, the trial court granted the motion in part and denied it in part. Petitioner appeals, raising

issues regarding the trial court's application of the MSA's true-up provisions, its finding that a substantial change in circumstances existed, and its directive that each party pay its own costs and attorney fees. We affirm as modified.

¶ 2                                I. BACKGROUND

¶ 3                                A. The MSA

¶ 4  The parties were married in 2003.  The three children born of the marriage were still  minors when the trial court entered the dissolution judgment.  Filed with the dissolution judgment was a joint parenting order that incorporated the parties' joint parenting agreement (JPA). In the JPA, the parties agreed to joint custody of the children and to a parenting time schedule.

¶ 5 The MSA noted that respondent was "employed as a Chiropractor and Instructor earning approximately $240,000 annually." The MSA contained provisions on child support and maintenance. Article 3 of the MSA addressed child support, stating in relevant part:

> "3.1. Husband shall pay to Wife as and for child support a total amount of thirty-two (32%) of his net income as defined by 750 ILCS 5/101 *et seq.* from all of Husband's sources of income for so long as Husband has an obligation to pay child support, including but not limited to bonuses, incentives, or any other type of compensation and including any net income generated by any of his various businesses/enterprises whether pre-marital, marital or postmarital. Based on the parties' calculations of Husband's current net income as of October 1, 2014, Husband shall pay to Wife thirty-two percent (32%) of his net income which is equivalent to the sum of four thousand seven hundred ($4,700.00) each month as and for his monthly child support obligation.

3.2. Husband's child support payments shall be paid directly by the Husband to Wife in two (2) equal installments of two thousand three hundred and fifty dollars ($2,350.00) which shall be due and payable on the 1st and 15th of every month. ***

3.3. Within thirty (30) days of Husband filing his taxes each year, Husband shall provide to Wife copies of his signed federal and state income tax returns with Form W-2's, Form 1099's and all schedules, including Form K-1's and any and all schedules relating to his businesses/enterprises.

3.4. Annually, when the tax return is furnished, the parties shall conduct a true up, wherein they shall compare the total net income earned by the Husband in the preceding year to the total amount of child support paid in order to determine whether the total support paid accurately reflects thirty-two percent (32%) of Husband's total net income for the year. If the Husband has not paid thirty-two (32%) of the net of all income received by him as defined in this Agreement, then he shall remit to Wife all sums due and owing within thirty (30) days thereof.

3.5. Husband's net income for purposes of the true up shall be determined in the following manner:

a. All income reported by Husband on his individual tax return reduced by federal income tax, state income tax and social security payments owed by Husband on said income; and,

b. All income received by Sport & Spine Rehab Institute, S.C. ('Sport and Spine'), or any other company which Husband uses to collect income from his work as an independent contractor, including any and all cash payments made to

Husband, reduced by thirty percent (30%) and further reduced by the total amount

Husband paid in health insurance premiums that year for himself and the children."

¶ 6    As it existed in January 2015, section 505(a)(1) of the Illinois Marriage and Dissolution of Marriage Act (Act) (750 ILCS 5/505(a)(1) (West 2014)) provided child support guidelines requiring the supporting spouse to pay, as "the minimum amount of support," a certain percentage of the spouse's income, based on the number of children to be supported. A trial court could deviate from the guidelines in the best interest of the child, as measured by various factors including the financial resources and needs of the parents. *Id.* § 505(a)(2)(b).

¶ 7 The MSA was consistent with section 505(a)(1) of the Act in that respondent was required to pay, for support of three children, 32% of his net income. *Id.* § 505(a)(1).

¶ 8 In article 6 of the MSA, respondent waived his right to maintenance and agreed to pay petitioner maintenance of $2500 per month for 36 months, commencing October 1, 2014.

¶ 9 The MSA also contained the following severability clause:

"Severability. It is expressly understood and agreed between the Parties that in the event a court of competent jurisdiction at any time after the entry of a Judgment of Dissolution of Marriage holds that a portion of this Agreement is invalid or unenforceable, the remainder hereof shall not be affected thereby and shall continue in full force and effect."

¶ 10                         B. Respondent's Motion to Modify

¶ 11 In September 2017, respondent filed a motion to modify both the parenting-time schedule in the JPA and the child support specified in the MSA. In June 2018, the trial court entered an agreed order reducing respondent's parenting time.

¶ 12 In September 2018, respondent filed an "amended motion to modify." In count I, he sought a reduction in child support, based on the following changed circumstances: (1) petitioner was unemployed and earning no income at the time of the January 2015 divorce, but since that time she earned a certificate in massage therapy and became the owner and operator of a massage studio with the potential to earn at least $50,000 per year, and (2) respondent's workload decreased since the divorce; specifically, he no longer taught at universities and was presenting fewer seminars per year.

¶ 13 In count II, respondent requested that the trial court, for true-up calculations for 2018 and beyond, modify the true-up provisions to accord with the current version of section 505. Under that version, the court no longer determines base child support by reference to the supporting spouse's income alone. See 750 ILCS 5/505(a)(1.5) (West 2018). Rather, section 505 uses the "income shares" model, by which back child support is computed by determining the parents' combined monthly net income and then calculating each parties' percentage share of the support obligation. *Id.*

¶ 14 In count III, respondent asked the trial court to determine true-up amounts under articles 3.4 and 3.5 of the MSA for 2015, 2016, and 2017, as the parties could not agree on what respondent owed for those years. Respondent proposed that the definition of "net income" in section 505(a)(3) of the Act (750 ILCS 5/505(a)(3) (West 2014)), rather than article 3.5(b)'s concept of "net income" should apply to respondent's business income from his company, Sport & Spine Rehabilitation Institute (Sport & Spine), and other sources. Thus, respondent asked that the court apply all (pertinent) deductions in section 505(a)(3), rather than just the two deductions specified in article 3.5(b), namely, the flat 30% deduction and the deduction for health insurance premiums. Respondent attached to his motion proposed true-up calculations applying the

deductions under section 505(a)(3) to all sources of respondent's income, including his business income.

¶ 15 In her response to the motion, petitioner denied that there were changed circumstances justifying a modification of child support. She further argued that the mere fact that the formula for computing child support changed since the MSA was signed did not warrant a modification of the true-up provisions. Finally, she argued that the trial court should strictly follow article 3.5b's definition of "net income" and not apply additional statutory deductions. Respondent attached her own proposed true-up calculations.

¶ 16 In February and March 2019, the trial court held a hearing on the amended motion to modify. Petitioner testified that she was not employed when the parties divorced in January 2015. She was previously employed with Sport & Spine, an S-corporation that respondent formed in November 2010. Since January 2015, petitioner earned a university certificate in massage therapy and received her state license and national certification in that field. In April 2015, she formed her own S corporation, Riverwalk Therapeutic Massage (Riverwalk), through which she provides therapeutic massage. Petitioner is also currently enrolled in a nursing program and expects to graduate in about two years.

¶ 17 Petitioner stated that she arranges her Riverwalk business around her schooling and family responsibilities, which "come first." She generates between one and seven "contact hours" per week (an hour of massage equals one contact hour).

¶ 18 Petitioner's federal individual tax returns for 2015, 2016, and 2017 were introduced into evidence. Petitioner's 2015 return reported $3702 in W-2 income, $2400 in alimony, $52,032 in capital gains from the sale of real estate owned by the parties, and a business loss of $31,779 incurred by Riverwalk. Petitioner's adjusted gross income for 2015 was $26,355. Petitioner

recalled that the $3702 in wages was from Sport & Spine and another employer, Hand & Stone Massage.

¶ 19    Petitioner's 2016 tax return reported $696 in W-2 income from Hand & Stone, $16,200 in alimony, and $484 in business income from Riverwalk.   Her adjusted gross income was $17,380. Petitioner reported gross receipts of $10,539 for Riverwalk.

¶ 20 Petitioner's 2017 tax return reported $22,500 in alimony and $3901 in business income from Riverwalk. Her adjusted gross income was $26,401. She reported $15,359 in gross receipts for Riverwalk. Petitioner testified that, in 2018, Riverwalk had gross receipts of $17,500.

¶ 21 Petitioner's financial affidavit from December 2018 reported gross monthly income of $4818, consisting only of $200 in "tips" and $4618 in child support (petitioner was not asked at the hearing why she reported no income related to her work). Petitioner claimed monthly living expenses of $6170. She acknowledged in her affidavit that she was "currently liv[ing] with another adult *** who helps pay [her] expenses." Petitioner explained that, since June 2017, she and the parties' children have resided with her boyfriend, David Riske, in the house that he owns. Petitioner has no lease with Riske but is paying half of the mortgage and utilities for the home.

¶ 22 Respondent testified that he is a chiropractor. In January 2015, he was earning income through teaching at universities and through Sport & Spine, through which he provides chiropractic services to student athletes at universities.

¶ 23 Respondent testified that Sport & Spine's gross receipts increased from 2015 to 2016, and again from 2016 to 2017, because he gave up his university teaching and worked more extensively in his sports medicine practice through Sport & Spine. Respondent also received income from seminars and speeches and from his interest in Midwest Rehabilitation Services (Midwest).

¶ 24 Respondent's federal individual tax returns for 2015, 2016, and 2017 were introduced into evidence. On his 2015 return, respondent reported, among several sources of income, $74,765 in W-2 income and $33,385 in business income from Sport & Spine. His adjusted gross income was $229,924. Sport & Spine had gross receipts of $160,726.

¶ 25 On his 2016 return, respondent reported, among other sources, $41,479 in W-2 income and $171,739 in S corporation and partnership income (from Sport & Spine and Midwest). His adjusted gross income was $196,873. Sport & Spine had gross receipts of $337,573.

¶ 26 Respondent's 2017 return reported, among other sources, $62,105 in W-2 income and $236,016 in S corporation income from Sport & Spine. His 2017 adjusted gross income was $282,823. Sport & Spine had gross receipts of $503,138.

¶ 27 Respondent's financial affidavit from December 2017 stated $25,962 in gross monthly income and $12,053 in monthly living expenses.

¶ 28 The parties testified that the child support provisions in article 3 of the MSA were negotiated during mediation. Each shared his or her understanding of why article 3.5(b) specified a flat 30% deduction from respondent's independent-contractor income earned through Sport & Spine and other sources. According to petitioner, the 30% deduction was included to account for personal expenses that Sport & Spine was paying for respondent, and because the "taxes were never paid on the business on time." As respondent recalled, the 30% deduction was meant to capture Sport & Spine's operating costs.

¶ 29 Tracy Demaj testified that she was petitioner's attorney during the dissolution proceeding. When the parties completed mediation, they provided Demaj with the mediation agreement, based upon which Demaj prepared the MSA, the JPA, and the dissolution judgment. As Demaj recalled, the true-up provisions in article 3.5 of the MSA were "very similar" to the true-up provisions in

the mediation agreement.[1] Demaj testified that, because respondent was "essentially running expenses through the company," the 30% deduction was included in an effort "to capture the income that [respondent] was receiving but not necessarily reporting."

¶ 30 In its own queries to Demaj, the trial court asked why article 3.5 did not include all deductions specified in section 505(a)(3) of the Act for calculating "net income" for child-support purposes. Demaj replied that some of the deductions were inapplicable; as for others, she did not know why they were not included.

¶ 31 The parties testified to their mostly unsuccessful efforts to agree on true-up amounts pursuant to article 3.5 of the MSA.

¶ 32 Following the hearing, the trial court took the motion to modify under advisement. The parties submitted written closing arguments with proposed true-up calculations for 2015, 2016, and 2017. Petitioner asked the trial court to strictly construe the definition of "net income" provided in article 3.5(b) and so reduce respondent's business income from Sport & Spine and other sources by only the blanket 30% deduction and the deduction for health insurance premiums, and not by all pertinent deductions in section 505(a)(3) of the Act. In her calculations, petitioner (1) reduced respondent's W-2 income by his federal and state income taxes and his social security contributions; (2) reduced respondent's "1099 income and ordinary business income" by only the blanket 30% deduction; and (3) reduced respondent's income from Sport & Spine by only the 30% deduction, health insurance premiums, and "previous W-2." Taking 32% of each year's true-up amount, and deducting for child support previously paid, petitioner concluded that respondent owed $75,919 in back child support for 2015, 2016, and 2017.

---

[1] The mediation agreement is in the record; its true-up provisions were reproduced without material change in article 3.5.

¶ 33 Respondent, by contrast, applied the following deductions to *all* sources of respondent's income: federal and state taxes, social security contributions, health insurance premiums, court-ordered life insurance premiums, and maintenance payments to petitioner. Respondent also applied the 30% deduction to respondent's income from Sport & Spine. By his calculation, respondent owed petitioner no back child support for 2015, 2016, and 2017.

¶ 34 The trial court issued a written ruling on April 8, 2019. As to count III, which requested true-up calculations, the court rejected petitioner's interpretation of article 3.5(b) of the MSA, which would have reduced respondent's Sport & Spine income by only the specified deductions. The court also rejected petitioner's suggestion that the 30% deduction was meant to cover taxes, because, the court noted, "there would be no tax due on 1120 Corporate income, as it passes through directly to [respondent]." The court further remarked:

"Both parties testified the [MSA] was the result of financial mediation with a non-lawyer and was reduced to writing by Wife's lawyer. Husband was not represented. 750 ILCS 5/505 defined net income for the purposes of child support. Deductions for the purpose of determining net income included properly calculated federal and state income taxes, FICA, Medicare, as well as other deductions.

In Article 3.5, the parties agreed that Husband may owe additional child support. However, in both sub-paragraphs they failed to include all of the statutory deductions in determining net income. The result would be a partial deduction for taxes on some income and no deduction for income taxes on other income. This would result in a windfall for Wife, as Husband would be paying child support on gross income from his business after the 30% deduction for business expenses and no deduction for any federal, state, FICA or Medicare taxes."

¶ 35 In its true-up calculations, the trial court reduced the combination of respondent's W-2 income and his Sport & Spine income by his federal and state income taxes, social security contributions, health insurance premiums, and maintenance. The court concluded that respondent owed petitioner back child support of $7870.

¶ 36 The court then addressed count I (reduction in prospective child support) in concert with count II (modification of true-up provisions). In addressing count I, the court made the threshold finding that there was "a substantial change in the financial position of the parties." Specifically, petitioner "completed her education and is now an owner of a business located in Naperville," and she was "residing with her boyfriend who is paying for the expenses of [petitioner] and her children." Applying the "income shares" approach in the current section 505 of the Act, the court calculated guideline support at $3452 per month. The court commented that respondent's current obligation of $4700 per month was "clearly in excess of guideline support" and that the expenses for the parties' children did not justify the figure.

¶ 37 The court then decided to deviate upward to $4000 per month, in conjunction with striking the true-up provisions from the MSA going forward. The court commented:

> "The Court finds a basis to deviate upwards from $3,452.00 per month to $4,000.00 per month in light of the termination of true-up provisions. ***
>
> In light of the extra child support [h]usband is paying, the Court finds additional child support would be a windfall to wife and will delete the [true-up] obligation in its entirety."

¶ 38 The court struck from the MSA articles 3.1 (setting child support at 32%), 3.2 (providing for twice-monthly payments of child support), 3.3 (requiring respondent to furnish his tax documents each year), 3.4 (providing for true-up procedure to determine if respondent paid

petitioner 32% of his "total net income for the year"), and 3.5 (defining "net income" for purposes of the true-up).

¶ 39 The trial court made the modified support retroactive to October 1, 2017, given that respondent filed his motion to modify on September 20, 2017. The court also ordered each party to pay his or her own costs and attorney fees.

¶ 40 Petitioner filed this timely appeal.

¶ 41                                    II. ANALYSIS

¶ 42 Petitioner raises three contentions arising from the trial court's disposition of respondent's motion to modify. First, she challenges the court's interpretation of the MSA's true-up provisions as it applied them to the years 2015, 2016, and 2017, and she also claims that the court erred in striking the provisions prospectively. Second, she disputes the court's finding of a substantial change in circumstances as a predicate for reexamining the child support ordered in January 2015. Third, she claims that the court erred by allowing her no opportunity to file a petition for contribution to the costs and attorney fees she incurred in opposing the motion to modify.

¶ 43                          A. The True-Up Provisions

¶ 44 Petitioner contends that the trial court, in calculating the true-up amounts for 2015, 2016, and 2017, erred by departing from the particular definition of "net income" in article 3.5(b) of the MSA and instead applying the definition of "net income" in section 505(a)(3) of the Act.

¶ 45 Respondent argues that we should not reach the merits of petitioner's claim, because she has forfeited it in various ways. First, respondent claims that petitioner relinquished her right to dispute respondent's proposed true-up formula (which the trial court essentially adopted), because she did not file her own *motion* for a true-up calculation but instead submitted her proposed calculations merely in a response to respondent's motion. Respondent cites *In re Custody of*

*Ayala*, 344 Ill. App. 3d 574, 584-85 (2003), and *Ligon v. Williams*, 264 Ill. App. 3d 701, 707-08 (1994), which stand for the proposition that pleadings frame justiciable matters and that a court lacks the authority either to decide issues that are not presented for adjudication or to grant relief that is not requested. For instance, in *Ayala*, the petitioner initiated a paternity action against the mother of his child and asked for joint legal custody. Subsequently, the trial court awarded joint custody to the petitioner's wife and parents. The appellate court held that the trial court lacked the authority to make the award, as "the issue of awarding shared custody to [the petitioner's] wife and parents was not properly before the court *** because no pleading in the case was directed at such relief and [the respondent] had no notice that the issue would be considered." *Ayala*, 344 Ill. App. 3d at 584.

¶ 46 Respondent follows up the citations to *Ayala* and *Ligon* with the comment that "a Response is not a Motion, Petition, or Complaint." In our view, respondent overextends the holdings of *Ayala* and *Ligon*, where the problem was the lack of *any* pleading raising the issue. Here, respondent's motion to modify sufficed to place the matter of true-up calculations before the court. Petitioner did not need to file her own motion raising the same issue in order to dispute respondent's suggested calculations and propose her own. Her response sufficed for these purposes.

¶ 47 Respondent also asserts that the true-up calculations submitted by petitioner did not place respondent on notice of petitioner's position on the matter of true-up calculations, because she did not explain "how [she] arrived at her net income figures [or] identify deductions from gross income, an issue hotly contested at the hearing." We disagree. Petitioner's calculations reflect the position that she took in the body of her response to respondent's motion, namely, that, for purposes of the true-up, respondent's business income should be reduced by only the blanket 30%

deduction and health insurance premiums, consistent with the plain text of article 3.5(b) of the MSA. Thus, respondent had full notice, going into the hearing, of how petitioner's position on deductions departed from respondent's.

¶ 48 Respondent also appears to assert that petitioner's calculations below, which subtract "previous W-2" from respondent's Sport & Spine income, conflict with her stance before this court, that the Sport & Spine deductions should be limited to those specified in article 3.5(b). This point has no merit. "Previous W-2" is not a deduction but an exclusion meant to avoid double-counting of respondent's W-2 income to the extent that it is included in the gross receipts of Sport & Spine. The trial court made the same exclusion, separating "Sport & Spine wages" from "Gross receipts for Sport & Spine *minus wages*" (emphasis added).

¶ 49 Next, respondent points to petitioner's testimony that she and respondent agreed that they would conduct a yearly true-up "to insure that the child support paid is equivalent to 32 percent [of] [respondent's] *net income*." (Emphasis added.) Respondent submits that this testimony "reveals that [petitioner] has always intended that child support be paid on net," *i.e.*, "net income" as defined in section 505(a)(3) of the Act. This is an overreach. Whether petitioner was referring to the statute or to the special definition of "net income" in article 3.5(b) is impossible to tell.

¶ 50 Having rejected all of respondent's claims of forfeiture, we move to the merits of petitioner's argument regarding the true-up provisions. In his motion to modify, respondent asked the trial court to modify the true-up provisions prospectively, to accord with the new version of the statute. However, for true-ups for the prior years, 2015, 2016, and 2017, respondent asked the trial court to apply the true-up provisions as written—but as interpreted in the way respondent advocated. The court performed true-up calculations for 2015, 2016, and 2017 and then struck, rather than modify, the true-up provisions prospectively. Petitioner contends that the court erred

in its true-up calculations for 2015, 2016, and 2017 and by striking the true-up provisions prospectively.

¶ 51 Our resolution of this issue turns on the interpretation of the MSA and its compliance with section 505 of the Act. An MSA is a type of contract, to which the normal rules of contract interpretation apply. *In re Marriage of Dundas*, 355 Ill. App. 3d 423, 425-26 (2005). The goal in interpreting an MSA is to ascertain the parties' intent, the best indicator of which is the language of the contract, given its plain and ordinary meaning. *In re Marriage of Woodrum*, 2018 IL App (3d) 170369, ¶ 108.

¶ 52 Likewise, the goal of statutory construction is to ascertain and effectuate the intent of the legislature. *1010 Lake Shore Ass'n v. Deutsche Bank National Trust Co.*, 2015 IL 118372, ¶ 21. As with contract language, the best indicator of legislative intent is the legislative text itself, given its plain and ordinary meaning. *Id.*

¶ 53 Both contract and statutory interpretation presents a question of law, for which our review is *de novo*. See *In re Marriage of McGrath*, 2012 IL 112792, ¶ 10 (statutory interpretation); *Blum v. Koster*, 235 Ill. 2d 21, 33 (2009) (interpretation of MSA).

¶ 54 To resolve the issue at hand, we look to section 505 of the Act as it existed in January 2015, when the dissolution judgment, incorporating the MSA, was entered. Section 505(a) authorized the court to "order either or both parents owing a duty of support to a child of the marriage to pay an amount reasonable and necessary for the support of the child." 750 ILCS 5/505(a) (West 2014). Section 505(a)(1) provides "guidelines" for determining "the minimum amount of support." *Id.* § 505(a)(1). The percentage of his or her "net income" that the supporting parent pays as support depends on the number of children to be supported. *Id.* Section 505(a)(2) states that "[t]he *** guidelines shall be applied in each case unless the court finds that a deviation

from the guidelines is appropriate after considering the best interest of the child in light of the evidence." *Id.* § 505(a)(2). Further, "[i]f the court deviates from the guidelines, the court's finding shall state the amount of support that would have been required under the guidelines, if determinable," and "[t]he court shall include the reason or reasons for the variance from the guidelines." *Id.* Section 505(a)(3) defined "[n]et income" as

"the total of all income from all sources, minus the following deductions:

(a)  Federal income tax (properly calculated withholding or estimated payments);

(b)  State income tax (properly calculated withholding or estimated payments);

(c) Social Security (FICA payments);

(d) Mandatory retirement contributions required by law or as a condition of employment;

(e) Union dues;

(f) Dependent and individual health/hospitalization insurance premiums and premiums for life insurance ordered by the court to reasonably secure payment of ordered child support;

(g) Prior obligations of support or maintenance actually paid pursuant to a court order;

(g-5) Obligations pursuant to a court order for maintenance in the pending proceeding actually paid or payable under Section 504 [(750 ILCS 5/504 (West 2014))] to the same party to whom child support is to be payable;

(h) Expenditures for repayment of debts that represent reasonable and necessary expenses for the production of income, medical expenditures necessary to preserve life or health, reasonable expenditures for the benefit of the child and the other parent, exclusive of gifts. \*\*\*

(i) Foster care payments paid by the Department of Children and Family Services for providing licensed foster care to a foster child." 750 ILCS 5/505(a)(3)(a)-(i) (West 2016).

¶ 55 Article 3.1 of the MSA states that respondent will pay, as child support, "thirty-two (32%) of his 'net income' as defined by 750 ILS 5/101 *et seq.* from all of [his] sources of income[.]" The parties agree that article 3.1 should be read to incorporate wholesale the definition of "net income" in section 505(a)(3), with all of its enumerated deductions.

¶ 56 Article 3.4 provides for a yearly "true up, wherein [the parties] shall compare the total net income earned by the Husband in the preceding year to the total amount of child support paid in order to determine whether the total support paid accurately reflects thirty-two percent (32%) of Husband's total net income for the year." Article 3.5 states that respondent's

"net income for purposes of the true up shall be determined in the following manner:

a. All income reported by Husband on his individual tax return reduced by federal income tax, state income tax and social security payments owed by Husband on said income; and,

b. All income received by [Sport & Spine], or any other company which Husband uses to collect income from his work as an independent contractor, including any and all cash payments made to Husband, reduced by thirty percent (30%) and further reduced by

the total amount Husband paid in health insurance premiums that year for himself and the children."

¶ 57 Petitioner submits that the plain intent of article 3.5(b) is to limit deductions to those specified. In her view, article 3.5(b) cannot reasonably be read to permit the deductions specified in article 3.5(a) (for taxes and social security) or to incorporate, as does article 3.1, the deductions in section 505(a)(3).

¶ 58 Respondent, on the other hand, proposes that article 3.5 "simply clarifies, as opposed to limits, the statutory deductions to be utilized in the calculation of net income" for true-up purposes. He goes on:

"The clear purpose of the language in [article] 3.5 is to ensure that a specific percentage of business expenses (30%) counts as a deduction from [respondent's] income when truing up, *in addition to all of the other clearly enumerated deductions laid out in the statute, such as health insurance premiums*." (Emphasis added.)

Respondent urges us to avoid petitioner's interpretation of article 3.5, because it would lead to two undesirable results. First, we would be construing article 3.5 to require double-counting of respondent's income to the extent that it is reported on both his individual tax returns and Sport & Spine's returns. Second, we would be reading article 3.5 as deviating from section 505(a)(3)'s definition of "net income" with its enumerated deductions. Respondent notes that such deviation would be improper given that the trial court included no reasons for deviation, as section 503(a)(2) requires.

¶ 59 Respondent is partly correct. A contract should be construed as consistent with public policy if its language reasonably permits it. *Lo v. Provena Covenant Medical Center*, 342 Ill. App. 3d 975, 984 (2003). We can reasonably—in fact, easily—avoid interpreting article 3.5 to

require the double-counting of income. Individual and business income are addressed in separate paragraphs in article 3.5, and there is no suggestion that child support is to be calculated by mechanically combining figures from individual and business tax returns without regard to overlap in reporting.

¶ 60 By contrast, we cannot reasonably avoid a conflict between *both* paragraphs of article 3.5 and section 305(a)(3)'s definition of "net income." To explain, we first examine decisions interpreting section 505. These cases demonstrate that courts have no discretion to depart from section 505(a)(3)'s definition of "net income." For instance, in *McGrath*, the supreme court held that the trial court erred in considering, as income to the respondent, withdrawals from his savings account. 2012 IL 112792, ¶¶ 11, 15-16 (citing 750 ILCS 5/505(a)(3) (West 2010)). The trial court's error in *In re Marriage of Bradley*, 2013 IL App (5th) 100217, ¶¶ 32-33, was in computing the respondent's net income under section 505(a)(3) without granting him the required deduction (see 750 ILCS 5/505(a)(4) (West 2010)) for court-ordered health insurance payments for the parties' children. And in *In re Marriage of Gabriel*, 2020 IL App (1st) 182710, ¶¶ 57-58, the trial court erred by failing to grant the respondent a deduction for court-ordered maintenance paid to the petitioner (see 750 ILCS 5/505(a)(3)(F)(II) (West Supp. 2017)).

¶ 61 The supreme court in *McGrath* acknowledged that a court determining child support might be "rightly concerned that the amount generated by [a party's] actual net income [is] inadequate." *McGrath,* 2012 IL 112792, ¶ 16. However, the court reassured, "[t]he Act *** specifically provides for what to do in such a situation." *Id.* The court explained that, "[i]f application of the guidelines generates an amount that the court considers inappropriate, then the court should make a specific finding to that effect and adjust the amount accordingly." *Id.*

¶ 62 The lesson of *McGrath* is that, though a trial court is allowed to deviate from the amount of support that the guidelines generate based on a party's net income, the court is not permitted to deviate from the measure of net income to which the guidelines apply in the first instance. *McGrath*'s holding aligns with the statutory text (which was the same when that case was decided as when the dissolution judgment here was issued). Section 505(a)(1) set forth "guidelines," *i.e.*, a table for determining, based on the number of children to be supported, the percentage of net income to be paid as support. 750 ILCS 5/505(a)(1) (West 2014). Section 505(a)(2) permitted deviation from the "guidelines" if warranted by the best interest of the child. The text of section 505 authorized no other manner of deviation from its dictates, including (as relevant here) section 505(a)(3)'s definition of "net income."

¶ 63 There were no MSAs in *McGrath*, *Bradley*, or *Gabriel & Shamoun*, but in our view the results would have been the same even if the parties had agreed to the departures from the statutory definition of "net income." There is no suggestion in these cases, or in the text of section 505, that an agreement by the parties can legitimize a departure that the trial court has no power in its own right to grant. See *In re Marriage of Fisher*, 2018 IL App (2d) 170384, ¶ 25 ("It is well settled that it is the *court's responsibility*, not the parties' responsibility, to determine the adequacy and amount of child support." (Emphasis in original.)).

¶ 64 We return to article 3.5 of the MSA. The subparagraphs of that article specify different deductions for different types of income. Subparagraph (a), addressing the income reported on respondent's individual tax returns, mentions only deductions for federal and state taxes and social security payments. Subparagraph (b), addressing business income from Sport & Spine and other sources, mentions only a 30% flat deduction and a deduction for health insurance premiums. Applying the maxim *expressio unius est exclusio alterius*, we draw two conclusions. First, the

parties meant the two subparagraphs to be mutually exclusive, such that the deductions specified for one type of income would not apply to the other type of income. Second, the parties intended to preclude all other deductions, including those enumerated in section 505(a)(3) of the Act. The court was particularly concerned that article 3.5(b) did not subject respondent's business income to a deduction for taxes, but the court also noted that "*both sub-paragraphs \*\*\* failed to include all of the statutory deductions in determining net income*" (emphasis added). Article 3.5's selectivity as to deductions contravened section 505(a)(3), creating, as the court noted, a "windfall" for petitioner.

¶ 65 The court's solution was to conduct a true-up as the court believed it should be done. The court applied the 30% deduction to respondent's business income, combined the balance with respondent's individual income, and then applied the following deductions: (1) federal income tax, (2) state income tax, (3) FICA, (4) Medicare, (5) health insurance, and (6) maintenance (article 3.5 mentioned no deduction for maintenance). The court's intent here, apparently, was to ensure that all pertinent statutory deductions were applied to all of respondent's income. The court did not ignore article 3.5—it applied the 30% deduction in subparagraph (b)—but rather inserted terms (deductions) into the article in an effort to conform it to section 305(a)(3). We appreciate the court's desire to preserve article 3.5, but its means were not reasonable. See *Lo*, 342 Ill. App. 3d at 984. A court "will not add language or matters to a contract about which the instrument is silent, nor add words or terms to the agreement to change the plain meaning, as expressed by the parties." *Empress Casino Joliet Corp. v. W.E. O'Neil Construction Co.*, 2016 IL App (1st) 151166, ¶ 62.

¶ 66 The court seemed to believe that the 30% deduction was proper because it represented business expenses (so the court found),[2] an allowed deduction under section 505. See 750 ILCS 5/505(a)(3)(h) (West 2014) (deduction for reasonable and necessary expenses for the production of income). The problem was not the substance of the deduction but rather its fixed percentage. The 30% deduction infringed section 505(a)(3)'s concept of "net income," because it was not keyed to actual business expenses. Thus, if respondent's actual business expenses were less than 30% of his business income, he would owe (*ceteris paribus*) less support than if section 505(a)(3)'s definition of "net income" were applied. *Fisher* highlights the problem with this possibility. In *Fisher*, the parties' MSA required the respondent to pay child support consisting of 28% of his net income, but the MSA placed a $300,000 cap on the gross income to be considered for child support. The income cap, we observed, implicated the children's interests because it allowed for less child support than was provided in the guidelines. *Fisher*, 2018 IL App (2d) 170384, ¶ 22. We treated the cap as a deviation from section 505(a)(1)'s support guidelines and held that it was invalid because the trial court did not include supporting reasons as required under section 505(a)(2).[3] This case is different from *Fisher*, of course, in that the 30% deduction departs from the concept of "net income" in section 505(a)(3), not from the support guidelines in section 505(a)(2). Nonetheless, analogously to the income cap in *Fisher*, the 30%

---

[2] Neither party disputes the court's finding, in the face of conflicting testimony, that the 30% deduction was designed to account for business expenses.

[3] In *Fisher*, we did not consider (because, presumably, we were not asked) whether this deviation was more properly seen as an impermissible (under *McGrath*) deviation from the definition of "net income" in section 505(a)(3).

deduction has the potential to suppress income that would otherwise be figured into the child support.

¶ 67 Conversely, if respondent's actual business expenses *exceed* 30% of his business income, he will owe (*ceteris paribus*) more support than if section 505(a)(3)'s definition of "net income" were applied, contrary to the holdings of *McGrath*, *Bradley*, and *Gabriel*.

¶ 68 In defense of the MSA, petitioner cites *In re Marriage of Razzano*, 2012 IL App (3d) 110608, and *In re Marriage of Sweders*, 296 Ill. App. 3d 919 (1998). Both cases involved MSAs that extended the termination date for child support beyond the default termination date in section 510(d) of the Act, and in both cases the court noted that section 510(d) expressly permitted such agreements. See *Razzano*, 2012 IL App (3d) 110608, ¶ 17 (citing 750 ILCS 5/510(d) (West 2004)); *Sweders*, 296 Ill. App. 3d at 922 (citing 750 ILCS 5/510(d) (West 1996)).

¶ 69 The pertinence of *Razzano* and *Sweders* is lost on us, as the present case does not involve section 510(d) and, moreover, petitioner neglects to draw any comparisons between section 510(d) and section 505 as to what MSAs may provide. As noted, *McGrath*, *Bradley*, and *Gabriel* hold that courts are not at liberty to depart from the definition of "net income" in section 505(a)(3), either by excluding what is properly "income" or by disallowing/limiting the enumerated deductions. Such deviation is not permitted even if the parties consent to it in an MSA.

¶ 70 We stress that, though the MSA has a severability clause, it would not be feasible to retain article 3.4 once article 3.5 was stricken. Article 3.4 states that the true-up process involves ascertaining respondent's "total net income," and article 3.5, immediately following, provides a particular definition of "net income" for purposes of the true-up. To strike article 3.5 and then interpolate, for instance, section 505(a)(3)'s definition of "net income" into article 3.4 would leave a true-up process like nothing the parties intended.

¶ 71 Having found that article 3.5 contravenes the concept of "net income" in section 505(a)(3) of the Act, we proceed to the question of remedy. The trial court's course of action was to conduct true-ups for the years 2015, 2016, and 2017 and then strike the true-up provisions prospectively. In conjunction with striking the provisions, the trial court ordered an upward deviation from guideline child support (from $3452 to $4000). Our view is that, since the true-up provisions were irreconcilable with the Act, the trial court should have simply struck them without conducting the true-ups. Accordingly, pursuant to Illinois Supreme Court Rule 366 (eff. Feb. 1, 1994), we eliminate that portion of the judgment directing respondent to pay petitioner $7870.13 per the court's true-up calculations. Our disposition of this issue moots petitioner's retroactivity argument regarding the trial court's application of the true-up provisions.

¶ 72                                    B. Substantial Change in Circumstances

¶ 73 The parties separately address whether there was a substantial change in circumstances justifying the trial court's reexamination of the child support ordered in the dissolution judgment. An order for child support may be modified "upon a showing of a substantial change in circumstances." 750 ILCS 5/510(a)(1) (West 2014). There is no precise formula for a substantial change in circumstances. "The law is clear that only some change in circumstances of *any nature* that would justify equitable action by the court in the best interests of the child is required." (Emphasis in original.) *In re Marriage of Singleteary*, 293 Ill. App. 3d 25, 35 (1997). Absent the threshold showing of a substantial change, the trial court may not reach the question of whether child support should be modified. *In re Marriage of Armstrong*, 346 Ill. App. 3d 818, 823 (2004).

¶ 74    The parties' arguments on the issue of a substantial change are based on changes to their financial conditions since January 2015. The parties have overlooked the elephant in the room. Neither party seems to have contemplated that we would affirm the trial court's decision to strike

the true-up provisions. Instead, the parties advocated for their own interpretations of the true-up provisions and appeared to believe that the provisions could be construed in such a way as to preserve their validity. To the contrary, we have held that the provisions are not salvageable and that the trial court should not have applied them to the years 2015, 2016, and 2017. The loss of the provisions, even just prospectively, was significant to the MSA's child-support scheme. Respondent's income came from several sources and was subject to fluctuation. The provisions held him accountable each year for shortages in child support. Petitioner had the benefit not only of this safeguard, but also of the windfall she received given the provisions' more inclusive concept of "net income." Petitioner's loss of this safeguard/windfall was itself, in our view, a substantial change in circumstances that warranted revisitation of support. See *In re Detention of Stanbridge*, 2012 IL 112337, ¶ 74 (reviewing court "may affirm a trial court's judgment on any grounds which the record supports even if those grounds were not argued by the parties"). The trial court understood the importance of the true-up provisions for petitioner; in conjunction with striking them prospectively, the court upwardly adjusted petitioner's monthly support under the new support guidelines.

¶ 75  For these reasons, we hold that the threshold was met for revisitation of child support. We note that petitioner does not argue in the alternative that, even if there were a substantial change in circumstances, the trial court erred in reducing her support.

¶ 76                              C. Contribution to Costs and Attorney Fees

¶ 77  In its order disposing of respondent's motion to modify, the trial court directed each party to pay his or her own costs and attorney fees. Petitioner claims that the court "did not provide either party with the ability" to petition for contribution.  According to petitioner, the court should not have made a decision on costs and fees when the issue "had not yet been presented before

[the court] through [a] contribution petition." Thus, petitioner appears to accuse the court of essentially preempting a contribution petition by issuing its written order. This claim has no merit. The court had the matter under advisement for a month before issuing its order. In that time, petitioner did not file a contribution petition. Nor did she ask the court, subsequent to its order, to reconsider the issue of costs and attorney fees.

¶ 78 Petitioner also seems to suggest that the trial court was required to make a *sua sponte* determination of whether petitioner was able to pay her costs and attorney fees. Petitioner cites no authority for this assertion. The law is clear that it was petitioner's burden to request that the trial court depart from the default rule that each party bear his or her own litigation costs. See *In re Marriage of Heroy*, 385 Ill. App. 3d 640, 667 (2008) ("Generally, it is the responsibility of the party who incurred attorney fees to pay for those fees," and "[i]t is the party seeking contribution toward her attorney fees who bears the burden of showing her insufficient financial resources and her spouse's ability to pay"). The court did not err.

¶ 79                              III. CONCLUSION

¶ 80 For the foregoing reasons, we affirm the trial court's judgment but eliminate, pursuant to Rule 366, the portion requiring respondent to pay petitioner $7870.13 per the court's true-up calculations.

¶ 81 Affirmed as modified.

---

**No. 2-19-0381**

---

| | |
|---|---|
| **Cite as:** | *In re Marriage of Solecki*, 2020 IL App (2d) 190381 |

---

| | |
|---|---|
| **Decision Under Review:** | Appeal from the Circuit Court of Du Page County, No. 17-MR-1449; the Hon. Linda E. Davenport, Judge, presiding. |

---

| | |
|---|---|
| **Attorneys for Appellant:** | James J. Laraia, of Laraia & Whitty, P.C., of Wheaton, for appellant. |

---

| | |
|---|---|
| **Attorneys for Appellee:** | Joseph P. O'Brien, of Opal O'Brien LLC, of Wheaton, for appellee. |

---